[798 NYS2d 21]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSE DIAZ, Appellant.

First Department, June 28, 2005

**APPEARANCES OF COUNSEL**

*Laura R. Johnson, The Legal Aid Society,* New York City (*Cheryl P. Williams* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney,* New York City (*Hilary Hassler* and *Eleanor J. Ostrow* of counsel), for respondent.

**OPINION OF THE COURT**

MAZZARELLI, J.P.

The primary issue on this appeal is whether defendant's right to confront the witnesses against him under the Sixth Amendment of the United States Constitution has been violated. Specifically, defendant asserts that the admission of a statement by a victim, who was unavailable to testify at trial, identifying him as one of his attackers was improperly admitted under *Crawford v Washington* (541 US 36 [2004]). Defendant also argues that the evidence was legally insufficient to support his

conviction for gang assault in the first degree, and, alternatively, that his conviction was against the weight of the evidence. Finally, defendant claims that the court erred in denying his application for a missing witness charge entitling him to a new trial.

## The Facts

Jose Diaz, Leonel Hernandez and Jose Ramirez were indicted for two counts of first-degree assault, and two counts of first-degree gang assault. These charges resulted from an attack on Neno Espejo and Eduardo Carillo in the Inwood section of Manhattan in the early morning hours of July 16, 2001. At trial, Espejo testified that on the evening of July 15, 2001, he and Carillo had gone to a friend's apartment to watch a videotape of their soccer team's most recent game. He stated that at approximately 3:30 A.M., he left to go home, and that Carillo walked with him. Espejo recounted that as the two reached the corner of Sherman Avenue and Thayer Street, a man standing outside the Los Compadres bar waved at Carillo, and Carillo crossed the street to talk to him. Espejo saw the man tap Carillo on the shoulder. Two others then emerged from the bar, and an argument ensued. Espejo went over and asked what was going on, and one of the men pushed him. Espejo testified that he and Carillo tried to run away, but someone grabbed Espejo's shirt and ripped it off. At this point, the group outside the bar had grown to about six, and one of them pulled out a box cutter and began to cut Espejo. The others punched and kicked him. Carillo and Espejo escaped momentarily, but Carillo dropped his cell phone. When Carillo stopped to retrieve it, the group caught up to them and grabbed Carillo. The man with the box cutter slashed at Carillo repeatedly, opening a huge gash at the side of his mouth and up his cheek. Others were simultaneously kicking Carillo. Eventually, Espejo and Carillo got away and Carillo called 911.

Police Officer Gallagher testified that at 3:45 A.M., he and his partner received a radio transmission, based on the 911 call, to go to the intersection of Dyckman Street and Broadway. Within a minute, they arrived at the location and encountered Espejo and Carillo. Gallagher stated that the men were so bloody that he could not see the source of their wounds. Upon closer inspection, Gallagher determined that Carillo had severe facial lacerations, and that Espejo had cuts on various parts of his body. Gallagher described both Espejo and Carillo as "dazed" from

the assault. He said Espejo appeared less injured than Carillo, although he was visibly shaken and vomiting. Officer Gallagher called for an ambulance.

Officer Brian Jay testified that he responded to the same 911 transmission and arrived at the scene about the same time as Gallagher. He said he took Espejo with him to canvass the area and that a few blocks away, they saw Hernandez. Espejo identified Hernandez,[1] and Jay noticed that he had blood on his shirt. Jay approached Hernandez, who appeared to be talking on a pay phone. When Jay asked to speak to the person on the phone, Hernandez handed him the receiver, and the officer heard only a dial tone. Jay took Hernandez into custody.

Meanwhile, Officer Timothy Garcia, who also came to the scene in response to the 911 call, had begun to search the area on his own. Garcia testified that at the corner of Dyckman Street and Sherman Avenue, about three blocks from Los Compadres, he was flagged down by a pedestrian. As a result of a conversation with that person, Garcia walked toward a small brick wall around the garbage storage area of 104 Sherman Avenue. There he found Diaz and Ramirez crouched amidst trash. He had to command them several times to stand up and show their hands, before they complied. Diaz had blood on his shirt, hands and face. Ramirez had blood on his hands. Garcia brought Diaz and Ramirez back to where Carillo lay on an ambulance stretcher. It was at this time that Carillo made the statement at issue and whose admission, defendant argues, violated his constitutional rights.

Over defense objection, the trial court allowed the following testimony from Officer Gallagher:

> "Q. You testified yesterday that there was a point in time when you were in the company of Eduardo Corillo[2] in an ambulance and two individuals, who are in the courtroom, were brought over to the vicinity of the ambulance. Firstly, can you tell me if you see those individuals in the courtroom? If so identify them?
>
> "A. Yes I do.

---

1. At trial Espejo recalled that at the time he identified Hernandez, Hernandez had long hair in a ponytail. However, Hernandez's precinct photograph shows that he did not have long hair. Jay confirmed that Hernandez did not have his hair in a ponytail.

2. Carillo's name is mistakenly transcribed as Corillo throughout the transcript.

"Q. Who are they?

"A. Mr. Ramirez and Mr. Diaz . . .

"Q. Who were you with when Mr. Ramirez and Mr. Diaz were brought over to the ambulance?

"A. I was with Mr. Corillo.

"Q. And if you recall what, if any reaction came from Mr. Corillo when Mr. Ramirez and Mr. Diaz were brought over?

"A. Reaction-wise, face lit up . . .

"Q. Did Mr. Corillo say anything at that time?

"A. Yes he did.

*"Q. What did Eduardo Corillo say when Mr. Ramirez and Mr. Diaz were brought over?*

"A. 'That's them.' " (Emphasis supplied.)

Officer Gallagher testified that he placed Diaz, Ramirez and Hernandez under arrest and vouchered the bloody shirts belonging to Diaz and Hernandez.[3] Carillo and Espejo were taken to Presbyterian Hospital for treatment, including stitches to close their lacerations. Photographs of the injuries were shown to the jury, which the parties stipulated were "serious" within the definition of the assault statute. There was no identification of Diaz by Espejo, and the People could not locate Carillo for the trial. The three defendants declined to present any witnesses.

At the charge conference, Diaz requested a missing witness instruction as to Carillo, arguing that the People had not established that he was unavailable. The People opposed the application, asserting that they did not have control over Carillo, and the court declined to issue the charge. The jury acquitted Hernandez and Ramirez, but convicted Diaz of gang assault in the first degree (involving Carillo).[4]

Several days after the verdict was rendered, defendant made a motion to set it aside based upon newly discovered evidence

---

3. No blood typing or DNA testing was performed on the bloodstained shirts. Gallagher testified that it is police department policy to reserve these tests only for homicides and rapes.

4. To simplify deliberations, the prosecution dismissed a number of counts in the indictment, leaving for the jury's consideration as to defendant and Ramirez, one count of gang assault in the first degree involving Eduardo Carillo, and as to Hernandez, one count of first degree assault involving Neno Espejo.

(CPL 330.30 [3]), consisting of a signed statement by Carillo, in which he asserted "Jose Diaz is innocent of this crime." At a hearing on the motion, Carillo testified that defendant was the man outside Los Compadres who had summoned him to cross the street. However, Carillo stated that he was not sure whether Diaz was one of the persons who had punched him or kicked him, but he was sure that Diaz had pushed him. He then testified, "I always wanted to think that he [Diaz] had no motive for hitting me and I don't know if he hit me or not, but I think—I think that they all hit me." Carillo explained that he meant, in his signed statement, only that Diaz was not the man who cut him. In opposition to the CPL 330.30 motion, the People argued that at the time of his appearance before the grand jury, when his memory was fresh, Carillo had been certain of his identification of Diaz as one of his assailants. The People also claimed Carillo had been contacted by Diaz and convinced to change his testimony. Immediately after the CPL 330.30 hearing, defense counsel submitted a supplemental affirmation, with an attached transcription of a telephone conversation between Carillo and an individual alleged to be Diaz's cousin. At this point, the defense contended that Carillo was extorting money from the Diaz family.

In its decision on the CPL 330.30 motion, the court credited Carillo's testimony before the grand jury, and rejected his later, equivocal and contradictory statements at the posttrial hearing. It also rejected Carillo's signed statement as having been procured by payoffs from the Diaz family. The court found that Carillo's hearing testimony, had it been offered at trial and credited by the jury, would, in fact have strengthened, rather than weakened, the prosecution's case against Diaz. The court also noted that the People's case would have been even stronger had evidence about the pretrial payoffs by the Diaz family been before the jury. Accordingly, the court denied the CPL 330.30 motion and the defendant was sentenced to five years' imprisonment.

### Discussion—The Confrontation Clause

In *Crawford v Washington* (541 US 36 [2004]), the United States Supreme Court enunciated a new rule. It held that if, in a criminal proceeding, a "testimonial" statement is admitted against the accused, the defendant has an absolute right, under

the Confrontation Clause of the Sixth Amendment[5] to cross-examine the person who made that statement. The Supreme Court held all such statements inadmissible if the witness is unavailable and the defendant did not have a prior opportunity to cross-examine him or her (*id.* at 53-54).

The *Crawford* case involved a defendant who was being tried for assault and attempted murder. The State introduced the recorded interrogation of his wife, to prove that the defendant's actions were not in self-defense (*id.* at 38). The Supreme Court found the wife's statements "testimonial," and thus inadmissible, because Washington State's marital privilege prevented her from testifying, and being subject to cross-examination at trial (*id.* at 68-69).

In *Crawford* there is a detailed history of the development of the common-law right to confrontation in England and the Colonies (*id.* at 43-50). In this discussion, the Supreme Court concluded that in drafting the Confrontation Clause, the Framers were specifically intending to eliminate the use of ex parte statements made to justices of the peace. At the time, it was the job of a justice of the peace to investigate and prosecute cases for the government (*id.* at 50) and the practice was to use the statements they had garnered against a defendant. The Court deliberately did not explain what statements are "testimonial" and thus implicate the Confrontation Clause, determining to "leave for another day any effort to spell out [its] comprehensive definition" (*id.* at 68). However, the Court did instruct that a declarant's statement "knowingly given in response to structured police questioning" would be considered testimonial (*id.* at 53 n 4). By contrast, it opined that statements made "unwittingly" to an agent of the government were less likely to constitute the type of evidence whose admission would violate a criminal defendant's right under the Confrontation Clause (*id.* at 58). The Court stressed that "[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse" (*id.* at 56 n 7). It also concluded that "at a minimum [the term 'testimonial' applied] to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations" (*id.* at 68).

---

5. The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

Prior to *Crawford*, there was a lively debate as to the admission of testimonial evidence and the Confrontation Clause, which was the subject of a number of law review articles.[6] Those articles were cited in *Crawford*, and since the Supreme Court's decision, courts throughout the country have been grappling with the issue. A discussion of the differing analyses of what constitutes a "testimonial" statement under *Crawford* in various jurisdictions, including New York, can be found in *Stancil v United States* (866 A2d 799, 810-812 [DC App 2005]).

In all of these discussions, close attention has been paid to the facts of the particular case under consideration, as the determination of whether a statement is "testimonial" or not can only be made by examining how the statement came about. Here, Carillo's statement was made spontaneously and not in response to any question by the police. It followed his "face [lighting] up" upon seeing Diaz and Ramirez, who were brought to him by the police. At the time he made the statement, he was lying on a stretcher in an ambulance, bleeding heavily and severely injured.

At the trial, which took place before *Crawford* was decided, the statement, "That's them," was admitted under the excited utterance exception to the hearsay rule. This long-hallowed exception allows the introduction of out-of-court statements when "made under the stress of excitement caused by an external event, and not the product of studied reflection and possible fabrication" (*People v Johnson*, 1 NY3d 302, 306 [2003]). " 'Underlying this exception is the assumption that a person under the influence of the excitement precipitated by an external startling event will lack the reflective capacity essential for fabrication, and, accordingly, any utterance he makes will be spontaneous and trustworthy' " (*id.*, quoting *People v Edwards*, 47 NY2d 493, 497 [1979]).

Courts have considered various factors in determining whether a statement constitutes an "excited utterance" and is thus spontaneous and trustworthy. These include: (1) the nature of the startling or traumatic event; (2) the amount of time between the event and the statement (*see People v Vasquez*, 88 NY2d 561, 579 [1996] ["the time for reflection is not measured

---

6. For comparison of the two extremes in defining "testimonial" under the Confrontation Clause compare Friedman, *Confrontation: The Search for Basic Principles* (86 Geo LJ 1011 [1998]) with Amar, *Confrontation Clause First Principles: A Reply to Professor Friedman* (86 Geo LJ 1045 [1998]; *see also* Friedman and McCormack, *Dial-In Testimony*, 150 U Pa L Rev 1171 [2002]).

in minutes or seconds, but rather is measured by facts" (internal quotation marks omitted)]); (3) the activities of the declarant between the event and the statement; (4) whether the declarant had an opportunity to deliberate and thus deviate from the truth; and (5) whether the circumstances indicate that the statement was not made "under the impetus of studied reflection" (*People v Edwards*, 47 NY2d at 497).

Some of these factors which qualify a declaration as an excited utterance may also disqualify it from being testimonial under *Crawford*. In the context of a statement to a government official, the spontaneous nature of an excited utterance can take it out of the category of those resulting from the "[i]nvolvement of government officers" made "with an eye toward trial" which concerned the Supreme Court in *Crawford*. Rather, such declarations are more appropriately considered among the group of utterances made "unwittingly" to a government agent whose admission would not implicate Confrontation Clause concerns. There are circumstances in which an excited utterance would arguably be testimonial, particularly where it was "given in reply to the deliberate questions of a police officer" (*People v Brown*, 70 NY2d 513, 522 [1987]). The particular nature of any police inquiry accompanying an excited utterance is a critical factor in determining whether the utterance is testimonial. We have recognized the fact that "*Crawford* repeatedly stresses the element of formality and reiterates that the Confrontation Clause was primarily directed at evidence bearing a resemblance to depositions and affidavits, even if unsworn." (*People v Coleman*, 16 AD3d 254, 254 [2005].) We have held that even if a statement was correctly considered an excited utterance under our rules of evidence, *Crawford* requires a further determination as to whether the statement was "testimonial" (*id.*).

In this case, the court properly admitted Carillo's statement at the ambulance as an "excited utterance" (*see People v Cotto*, 92 NY2d 68, 79 [1998], *writ of habeus corpus granted on other grounds* 331 F3d 217 [2003]; *People v Fratello*, 92 NY2d 565 [1998], *cert denied* 526 US 1068 [1999]; *People v Encarnacion*, 259 AD2d 309 [1999], *lv denied* 94 NY2d 862 [1999] [statements by victim at hospital]; *People v Worrol*, 242 AD2d 471 [1997], *lv denied* 91 NY2d 899 [1998]). At the time Carillo identified defendant, he was lying in an ambulance, being treated for multiple cuts and other injuries from an attack which took place within the previous half hour (*see People v Torres*, 196 AD2d 758 [1993], *lv denied* 82 NY2d 854 [1993] [statement

made by victim on stretcher awaiting treatment properly admitted as excited utterance]).

As Carillo's statement from the ambulance was a visceral response to the presence of his attackers, and his statement was volunteered, rather than the result of structured police questioning, there was no *Crawford* violation in this case (*see Coleman*, 16 AD3d at 254 [excited utterance in 911 call not "testimonial" under *Crawford*]; *People v Newland*, 6 AD3d 330 [2004], *lv denied* 3 NY3d 679 [2004] [brief, informal remark to police officer not testimonial under *Crawford*]; *Mungo v Duncan*, 393 F3d 327, 336 n 9 [2d Cir 2004], *cert denied sub nom. Mungo v Greene*, — US —, 125 S Ct 1936 [2005] [describing, as nontestimonial, statements made in "emergency circumstances to help the police nab . . . assailants"]; *see also Leavitt v Arave*, 383 F3d 809, 830 n 22 [2004] [opining that excited utterance by victim identifying defendant to police would not violate *Crawford*]; *State v Forrest*, 164 NC App 272, 596 SE2d 22 [2004], *affd* 359 NC 424, 611 SE2d 833 [2005] [excited utterance was not testimonial under *Crawford*]).

## Legal Sufficiency/Weight of Evidence

Defendant next argues that there was insufficient evidence to support his conviction, or alternatively, that the verdict was against the weight of the evidence. The standard for appellate review of the legal sufficiency of a criminal trial verdict is "whether any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People" (*People v Williams*, 84 NY2d 925, 926 [1994]; *see also People v Hines*, 97 NY2d 56, 62 [2001]; *see also Jackson v Virginia*, 443 US 307, 319 [1979]).

Our role on a weight of the evidence review is broader than the evaluation of sufficiency, and " '[e]ven if all the elements and necessary findings are supported by some credible evidence, the court must examine the evidence further' " (*see People v Cahill*, 2 NY3d 14, 57 [2003], quoting *People v Bleakley*, 69 NY2d 490, 495 [1987]). "If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' " (*Bleakley*, 69 NY2d at 495, quoting *People ex rel. MacCracken v Miller*, 291 NY 55, 62 [1943]). We must determine,

akin to a thirteenth juror, whether the trier of fact has given evidence the weight it should be accorded (*People v Rayam*, 94 NY2d 557, 560 [2000]).

Diaz and Ramirez were charged as acting in concert to commit gang assault in the first degree. Penal Law § 120.07 defines this crime as follows:

> "A person is guilty of gang assault in the first degree when, with intent to cause serious physical injury to another person and when aided by two or more other persons actually present, he causes serious physical injury to such person or to a third person."

The jury was instructed that, to find Diaz guilty, the People had to establish that defendant, "acting with the mental culpability required for the commission of [Penal Law § 120.07], . . . intentionally aid[ed] another person in the commission thereof" (Penal Law § 20.00).

■ Diaz contends that the evidence was insufficient to establish that he participated in the attack of Carillo because it was largely circumstantial. Citing *People v Whalen* (59 NY2d 273 [1983]), the defendant argues that the identity of the accused is an element of every crime, one which was not proven here. However, Carillo's statement "That's them," when taken in context of all the other evidence, established defendant's identity as one of the attackers beyond a reasonable doubt. The testimony and the documentary evidence introduced at trial, that multiple individuals were involved in kicking, punching and slashing Carillo, and the stipulation that Carillo suffered serious injuries as a result of the attack satisfied all of the elements of Penal Law § 120.07. Further, we agree with the jury's assessment of the strength of the evidence inculpating Diaz as a participant in the attack.

## Missing Witness Charge

■ Defendant finally argues that he is entitled to a new trial because the court failed to give a missing witness charge as to Carillo. The "missing witness" charge "allows a jury to draw an unfavorable inference based on a party's failure to call a witness who would normally be expected to support that party's version of events" (*People v Savinon*, 100 NY2d 192, 196 [2003]). The Court of Appeals has articulated three preconditions for the instruction: (1) the witness's knowledge must be material to the trial; (2) the witness must be expected to give noncumulative testimony favorable to the party against whom the charge

is sought; and (3) the witness must be available to the party against whom the instruction is sought (*see People v Gonzalez,* 68 NY2d 424, 427 [1986]). The standard for our review of a court's determination on the instruction is whether it was an abuse of discretion (*see People v Macana,* 84 NY2d 173 [1994]).

The last time Carillo was seen before trial was on the day he appeared before the grand jury. Further, the evidence adduced at the CPL 330.30 hearing strongly indicated that the defense was aware, even before the People, that Carillo would not appear to testify, and that Diaz and his family played a role in Carillo's disappearance. Unaware of these facts, the prosecution diligently attempted to find Carillo to testify at trial. They sent police officers to his last known address, but the occupants of the apartment knew nothing as to Carillo's whereabouts. Police also spoke to people in that area, but they also did not have any information to help locate Carillo. Carillo's cell phone was disconnected, and Espejo, the other victim, testified at trial that he did not know where Carillo was. In light of these facts, the court providently exercised its discretion in declining to issue the instruction. Clearly the People established that the witness "had become unavailable by the time of trial despite reasonable efforts by the People to locate him" (*People v Jenkins,* 213 AD2d 279, 280 [1995], *lv denied* 85 NY2d 974 [1995]).

Accordingly, the judgment of the Supreme Court, New York County (Renee A. White, J.), rendered June 25, 2002, convicting defendant, after a jury trial, of gang assault in the first degree, and sentencing him to a term of five years, should be affirmed.

MARLOW, ELLERIN, GONZALEZ and CATTERSON, JJ., concur.

Judgment, Supreme Court, New York County, rendered June 25, 2002, affirmed.