[848 NYS2d 156]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THOMAS GANTT, Appellant.

First Department, December 27, 2007

APPEARANCES OF COUNSEL

*Steven Banks, The Legal Aid Society,* New York City (*Paul Wiener* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney,* New York City (*Susan Gliner* of counsel), for respondent.

**OPINION OF THE COURT**

SULLIVAN, J.

At issue on this appeal of a murder conviction is a challenge to the admission, after an in limine ruling denying defendant's motion to preclude, of statements made by the victim separately to three witnesses identifying defendant as the murderer. The statements were admitted as excited utterances. Defendant also argues that the admission of the statements violated his Sixth Amendment right to confrontation under *Crawford v Washington* (541 US 36 [2004]).

The trial evidence reveals the following. In late July 1994, the victim, Richard Moore, was selling drugs out of a building located at 154 West 130th Street in Manhattan, employing two or three "young kids" who assisted him in selling cocaine, heroin and crack. John Haywood, who had known Moore since 1977, released from prison that same month, looked up Moore. For the first few days after his initial visit with Moore, Haywood took no part in Moore's drug operation. About a week later, he began working for Moore, five days a week, 12 hours a day, for about $200 per week. The drugs were generally kept in an apartment with a certain amount kept in a mailbox downstairs. Haywood would station himself in front of the building, waiting for customers to arrive.

About two weeks after Haywood began working, he and Moore were standing outside the building when defendant, whom Moore identified as "Tommy," rode up on a bicycle. Defendant and Moore engaged in conversation, which Haywood could not hear, although he did notice that the conversation did not appear to be friendly. After defendant left, Moore informed Hay-

wood that the two had had a prior drug relationship, but that there had been a difference of opinion. Haywood resolved to "keep an eye out" for defendant.

That same week, Haywood saw defendant on two different occasions passing by Moore's drug spot. Thereafter, Haywood noticed that defendant had his own drug operation on 130th Street. About a week after first meeting defendant, Haywood, alone and in front of Moore's drug spot, was approached by a woman whom he had never met before. She asked Haywood if he was working; responding that he was, he directed her into the building. Haywood followed the woman inside and sold her a bag of heroin for $10, after which the woman left.

Within minutes, Moore pulled up in his car and walked over to Haywood. As the two men talked, Haywood noticed that the woman who had just made the drug purchase was approaching with defendant. Speaking to Moore, defendant asked, "What's this I'm hearing, you are using my name in your spot?" Moore replied, "I don't know what you are talking about." The woman spoke up, "I just bought something from there and you said it was Tommy's stuff," at which point Haywood acknowledged that he had just sold her a bag of heroin, but insisted he had "never said that we were working for Tommy or we had Tommy's product." Defendant warned Moore, "I don't want to hear this no more, I don't want no more customers coming down here telling me that you are serving them using my name." Moore kept insisting that he did not know what defendant was talking about. At the end of the discussion defendant walked away.

On August 15, 1994, about a week and a half later, shortly before 9:00 P.M., Moore's friend, Anthony Pinkston, was sitting on the stoop of an abandoned building while Moore and Haywood were standing in front of the drug spot "two doors away." At that point a regular customer who lived in the building called out to Haywood. He was about to attend to her, when a shot rang out and flew over his head. Haywood, "in shock," ducked down and covered his head. When he turned, he saw Moore falling back onto a chair. Haywood then observed defendant, with a ski hat folded over his forehead, stepping onto the sidewalk, no more than four to five feet away, by the curb. Haywood looked directly at defendant's face and had no doubt as to the shooter's identity. Panicking as defendant continued shooting, he pushed the woman who was looking to purchase drugs into the building and both fled up the stairs.

Pinkston, who had never before met defendant, testified that he observed a man approaching on a bicycle, wearing a black and gray mask that covered the lower half of his face. The man pulled out a long silver gun from behind his back, prompting Pinkston to scream out to Moore, "Rich, he got the jammy." Pinkston, unsure who the gunman's target was, also ran into the building as two more shots rang out. As he ran up the stairs, he heard three more shots.

Both Haywood and Pinkston ended up together on the roof, from which they looked down and saw Moore lying prone on the sidewalk and defendant riding off on his bicycle. Haywood ran downstairs and, finding that Moore was still alive, cradled him as he tried to talk. Moore said, "[I]t was Tommy," and Haywood replied, "I know, don't talk, I know." A friend of Haywood's pulled him away, telling him to "get out of here." Haywood eventually flagged down a taxicab.

Pinkston testified that by the time he reached Moore, he was coughing blood and in "pretty bad shape." Moore told him he had been hit "two or three" times. Pinkston used Moore's cell phone to call 911. Moore said to Pinkston, "Get the smoke off me, get the smoke off me. . . . The smoke is in my sock." Still coughing up blood, Moore then said, "That punk ass nigger Gantt shot me." When Pinkston asked, "Who?" Moore repeated, "That punk ass nigger Tommy Gantt."

At about 8:50 P.M., Police Officer McDermott, on radio motor patrol on 150th Street, received a transmission of a "male shot." Arriving at the scene, she found Moore, lying on the sidewalk, shot in the left thigh and stomach. Although Moore was conscious, his condition appeared critical. When McDermott asked who shot him, Moore replied, "Tommy Grant." Pinkston, still present at the scene, furnished Moore's pedigree information to McDermott.

Moore underwent emergency surgery that same night. After undergoing a series of operations and transfusions, his condition seemed to improve, but later began to deteriorate. He died on New Year's Day, 1995, 4½ months after being shot, never having left the hospital.

Haywood did not contact the police about the shooting even after he learned that Moore had died. More than five years later, when Haywood was serving a prison sentence, a police detective investigating the double homicide of Haywood's nephew and the nephew's girlfriend spoke to Haywood, who, although not an eyewitness, was helpful in aiding the police in

determining, inter alia, the motive for the killings. About two months later, both the detective and the trial prosecutor in the double homicide interviewed Haywood a second time. At one point, Haywood, acknowledging the detective's role in working on "old homicides," told him he had once witnessed one and provided information about the Moore shooting, including the month and year it occurred and the name "Tommy" as the killer. Upon further investigation, the detective located Pinkston and ultimately, defendant, leading to this prosecution.

Defendant does not contest the legal sufficiency of the evidence against him, although in the course of arguing that the trial court improperly admitted the victim's statements identifying him as the shooter, he claims that the other evidence against him was "extraordinarily weak." A review of the record, however, shows that defendant's guilt was established beyond a reasonable doubt not only by the statements of the victim after he was shot and lay bleeding on the ground, but also, independently, through the identification testimony of the witness Haywood.

On appeal, as noted, defendant argues that the challenged statements made to Haywood, Pinkston and Officer McDermott, identifying him as Moore's assailant, do not fall within the excited utterance exception to the prohibition against hearsay evidence, and that their admission violated his right of confrontation. In denying the motion to preclude, the court determined that the statements, made "within minutes of the shooting, clearly qualif[y as] excited utterances under New York law," that none of them was testimonial within the meaning of *Crawford*, and that they were sufficiently reliable otherwise to meet federal and state constitutional requirements.

An extrajudicial statement will be admitted under the excited utterance exception to the hearsay rule when it relates to a startling event and is made while the declarant remains under the stress of excitement caused by the startling event (*see People v Johnson*, 1 NY3d 302, 306 [2003]; *People v Nieves*, 67 NY2d 125, 135 [1986]). Such statements are considered intrinsically reliable by virtue of the fact that when a declarant speaks under the influence of such stress or excitement, his or her reflective capacity, and thus the ability to fabricate, is stilled (*id.*). The test for admission of such a statement is whether the declarant was "so influenced by the excitement and shock of the event that it is probable that he or she spoke impulsively and without reflection" (*People v Caviness*, 38 NY2d 227, 231 [1975]; *see*

*People v Brown*, 70 NY2d 513, 522 [1987]). It is well established that even responses to questions may qualify as excited utterances (*People v Edwards*, 47 NY2d 493 [1979]).

In deciding whether a statement qualifies as an excited utterance, the court must determine the nature of the startling or traumatic event, the time lapse between the occurrence and the statement, the activities of the declarant in the interim to ascertain whether he had the opportunity to deliberate and depart from the truth, and whether circumstances indicate that the "remarks were not made under the impetus of studied reflection" (*id.* at 497). Ultimately, a statement's admissibility is entrusted to the sound discretion of the trial court, whose ruling should not be disturbed, absent a clear abuse of discretion (*see People v Carroll*, 95 NY2d 375, 385 [2000]).

■ That the statements at issue were precipitated by an event that was startling and traumatic to Moore is beyond dispute. As to the time lapse between the event and the statement, the time for reflection is not measured in minutes or seconds, but rather by the facts (*People v Vasquez*, 88 NY2d 561, 579 [1996]). Moore's identifications of defendant to Haywood, Pinkston and Officer McDermott, as he lay seriously wounded and bleeding on the sidewalk almost immediately after the shooting, were made under circumstances that did not allow for "studied reflection," but rather were uttered while Moore was "under the stress of excitement caused by [the] external event" (*Edwards*, 47 NY2d at 497). The evidence of Moore's mental and physical trauma from the shooting and his on-the-scene, close-in-time identification of defendant as his assailant rendered his statements "near-classic" instances of the excited utterance exception (*see People v Fratello*, 92 NY2d 565, 570 [1998], *cert denied* 526 US 1068 [1999]).

Defendant argues that the reliability of such statements was fatally undermined by Moore's statement to the police nine days after the shooting that he had identified defendant as the shooter merely because he had heard somebody on the street around the time of the shooting say defendant's name. In *Fratello*, the Court of Appeals rejected a similar argument where the victim made on-the-scene statements that qualified as excited utterances, despite a later recantation, both by affidavit and in his testimony as a defense witness that the defendant was not one of the two assailants. The victim's initial statements were properly admitted as excited utterances, since they "could rationally and objectively have been credited by the trial

court as inherently more reliable than [the victim's] later versions, formulated once 'there ha[d] been time to contrive and misrepresent' " (*id.* at 574 [citation omitted]; *see People v Torres*, 196 AD2d 758 [1993], *lv denied* 82 NY2d 854 [1993] [on-the-scene utterance by victim of shooting "provided adequate indicia of reliability" despite his "conflicting testimony before the grand jury" eight days later]).

Similarly, the trial court correctly ruled that Moore's subsequent recantation of his on-the-scene identifications of defendant notwithstanding, his initial statements were demonstrably trustworthy so as to be admitted as excited utterances. In contrast, Moore's subsequent statements to the police, made nine days after the shooting, in which he claimed that he had been unable to see his assailant's face, were far less reliable. Upon "studied reflection," with every reason to believe that he had survived the shooting, Moore was undoubtedly convinced that it now was in his own self-interest to deny the earlier statements implicating a fellow drug dealer. Significantly, Moore's statement to the police denying that defendant was the shooter was intertwined with demonstrable lies; for example, despite evidence to the contrary, he told the police he did not even know defendant, even though he later confirmed that he and defendant had had a drug dispute similar to the one described by Haywood. Thus, as the trial court noted, Moore's recantation, while a factor in a jury's assessment of the weight to be given the identification statements, did not sufficiently undermine the reliability of those statements to render them inadmissible as excited utterances.

Defendant argues that Moore's request that Pinkston remove the marijuana from his sock before the police arrived, indicating Moore's manifest self-interest, shows that at the time of the statements, "it cannot . . . be said that he did not possess a sufficient mental state such that he was incapable of fabrication." While, as the trial court ruled, Moore's request was a "relevant consideration" for jury consideration on the weight to be given the statements, his severely impaired physical condition at the time rendered it highly unlikely that he had the opportunity to "deliberate and thus deviate from the truth" as to the identity of the person who shot him (*People v Diaz*, 21 AD3d 58, 66 [2005], *appeal dismissed* 7 NY3d 831 [2006]). While a seriously wounded person might reflexively recognize the adverse consequences of having the police find drugs on him, it is quite improbable that such a person would have the capacity for the

"studied reflection" required to implicate intentionally the wrong person as the shooter.

■ Nor is there merit to defendant's argument that, under the Sixth Amendment's Confrontation Clause as interpreted in *Crawford* (541 US 36 [2004], *supra*), the three statements at issue constituted testimonial hearsay that was improperly admitted. In *Ohio v Roberts* (448 US 56, 66 [1980]), the Supreme Court held that the Confrontation Clause did not bar the admission of an unavailable witness's out-of-court statement against a defendant in a criminal proceeding provided the statement "bears adequate 'indicia of reliability' . . . [which] can be inferred without more . . . where the evidence falls within a firmly rooted hearsay exception." In *White v Illinois* (502 US 346, 355 n 8 [1992]), the Court noted that the exception to the hearsay rule for spontaneous declarations, synonymous with the excited utterance exception, was "firmly rooted" (*see also People v Del Vermo*, 192 NY 470, 483 [1908]). Thus, statements satisfying the excited utterance exception carried such indicia of reliability that a trial court's case-by-case assessment of reliability was not required for their admission in evidence.

In *Crawford*, the Supreme Court, in revisiting the admission of hearsay statements in criminal trials, examined the historical roots of the Confrontation Clause, noting that it was designed principally to address the civil-law mode of criminal procedure, and in particular, its use of ex parte, pretrial examinations of witnesses as evidence against the accused, a common practice in England that the framers of the Constitution wished to ban (541 US at 50). These statements, free from the test of cross-examination, would later be introduced at trial as part of the prosecution's case. Thus, the Court held, the Confrontation Clause does not permit "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination" (*id.* at 53-54).

The Court defined "this core class of 'testimonial' statements . . . [as] '*ex parte* in-court testimony or its functional equivalent . . . such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially' " (*id.* at 51). Testimonial statements would also include extrajudicial statements "contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," as well

as statements taken by police officers in the course of interrogations, even though unsworn (*id.* at 52). In contrast, the Court indicated that the admission of nontestimonial hearsay statements, regardless of whether the defendant had an opportunity to cross-examine the declarant, was not barred. As the Court explained, "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law" (*id.* at 68).

Applying these principles, the Supreme Court reversed Crawford's conviction. He had been charged with stabbing a man who had allegedly attempted to rape his wife. As part of the investigation, the police brought her to the precinct and, after reading her the *Miranda* rights, interviewed her and tape-recorded the interview. The defendant invoked the state's marital privilege and his wife did not testify. Her recorded interview was admitted, the trial court finding it reliable. The Supreme Court, abandoning its reliability test under *Ohio v Roberts*, found the wife's testimony to be "testimonial hearsay" and inadmissible absent unavailability and a prior opportunity for cross-examination.

The Supreme Court subsequently availed itself of the opportunity to expound on its definition of testimonial hearsay in the companion cases of *Davis v Washington* and *Hammon v Indiana* (547 US 813 [2006]), in which statements by nontestifying declarants were admitted as excited utterances in each of the defendants' trials. The Court held:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution" (547 US at 822).

In *Davis*, Michelle McCottry called 911 but the call was terminated before anyone spoke. The 911 operator reversed the call and, in response to the operator's questions, McCottry explained that her boyfriend, the defendant, was in her house "jumpin' " on her again, and using his fists. The operator learned that the defendant had just run out the door and was

driving away. When the police arrived about four minutes later, they observed McCottry still shaken and frantic. She did not testify at trial; instead, the prosecutor played the 911 tape. The defendant was convicted of a felony for violating a domestic protective order.

In *Hammon*, the police responded to a report of a domestic disturbance at the home of the defendant and his wife. On arrival, they observed the wife alone on the front porch. Although she appeared somewhat frightened, she assured the police that "nothing was the matter" and allowed them to enter the house, where they observed a gas heating unit with its glass front broken. They spoke to the defendant, who admitted that he and his wife had argued but that everything was "fine" now; he denied that it had become physical. In another room, the wife told the officers what had happened; one of them had her fill out and sign a "battery affidavit" describing the incident. She did not testify at trial, but the statements she made to the officers before filling out the affidavit were admitted as excited utterances. The defendant was convicted.

Applying its "primary purpose" test, the Court in *Davis* found that McCottry's initial statements to the 911 operator, identifying the defendant as her assailant, were not testimonial,* noting that when it held, in *Crawford*, that interrogations by law enforcement officers fall squarely within the class of testimonial hearsay (541 US at 53), it was referring to the type of interrogation conducted in *Crawford*, where the questioning was "solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator" (547 US at 826). In *Davis*, the Court found that the 911 operator's interrogation was not primarily to establish or prove some past fact, but rather "to describe current circumstances requiring police assistance" (*id.* at 827).

The Court found several important differences between the 911 operator's questions in *Davis* and the police interviews of Crawford's wife. McCottry was speaking about events as they were occurring, whereas the *Crawford* interrogation had taken place hours after the event. Furthermore, any reasonable

* As the Court explained, it had been asked to address only the first portion of the 911 tape. It implied that certain of McCottry's statements in response to the operator's questions were testimonial, being made after the operator had obtained the information needed to "address the exigency of the moment" (547 US at 828).

listener would realize that McCottry was seeking help for an ongoing emergency. The Court noted that "the nature of what was asked and answered in *Davis*, again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past" (*id.*). This was so in *Davis* despite the operator's attempt to determine the identity of the perpetrator so that officers would know whether they would be confronting a violent felon. The Court also noted the significant difference between the interview in *Crawford* and the 911 operator's questions of McCottry. Crawford's wife "was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers," whereas "McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe" (*id.*). All of these facts considered, the Court determined the primary purpose of the 911 operator's initial questions to McCottry was to enable the officers to meet the exigencies of an ongoing emergency.

Mrs. Hammon's statements to the police officer, on the other hand, were held to be testimonial. As in *Crawford*, it was "entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct" (*id.* at 829). The emergency was over; in fact, Hammon's wife told the officers that the dispute had ended and that everything was all right. Any questioning of her was conducted in order to investigate what had occurred, not what was occurring. And, although unlike *Crawford,* where the statement was taken at a police station, the interview was nonetheless conducted in a separate room from where the defendant was being detained, and Mrs. Hammon was asked to recount how the incident had begun and progressed.

New York's Court of Appeals, in two recent cases, has applied the Supreme Court's pronouncements in *Davis* and *Hammon* in determining whether a statement admitted at a criminal trial constituted testimonial hearsay and was improperly allowed in evidence. In *People v Bradley* (8 NY3d 124 [2006]), a police officer, responding to a 911 call, arrived at an apartment door to find a shaken woman, bleeding profusely and limping. In response to the officer's question as to what happened, the woman said her boyfriend had thrown her through a glass door. The of-

ficer found the defendant in the apartment and also observed a broken glass door. Applying the *Davis* "primary purpose of the interrogation" analysis, the Court held that although the statement had been elicited in response to the police officer's inquiry, there had been no right of confrontation violation because "the officer's evident reason for asking the question was to deal with an emergency" (*id.* at 125).

In *People v Nieves-Andino* (9 NY3d 12 [2007]), an associate of a drug dealer who was shot on a Bronx street where he sold drugs called 911. One of the police officers responding to the scene observed the victim bleeding and grimacing in pain. When the officer asked what happened, the victim responded that he had argued with a man named Bori, who shot him three times. In moving to exclude the victim's statement on the ground of testimonial hearsay, the defendant argued that because the assailant had left the crime scene and no longer posed a physical threat to the victim, the police officer's primary purpose in questioning the victim could not have been to deal with an ongoing emergency. The Court of Appeals rejected that argument, refusing to accept such a restrictive interpretation of what constitutes a continuing emergency. "Even when the assailant has fled, the circumstances of the police officer's questioning of the victim may objectively indicate that the officer reasonably assumed an ongoing emergency and acted with the primary purpose of preventing further harm" (*id.* at 15). The officer's "brief solicitation" of information was not an attempt to learn about past events, but rather "was part of [his] reasonable efforts to assess what had happened to cause [the victim's] injuries and whether there was any continuing danger to the others in the vicinity" (*id.* at 16).

With these precedents as our guideline, it is clear that none of the three statements challenged here was testimonial in nature. Moore's statements to his two friends, Haywood and Pinkston, as he lay bleeding on the ground, bear no similarity to the kind of formal interrogation by authorities that the Supreme Court found to be part of the "Sixth Amendment's core concerns" (*Crawford*, 541 US at 51). Nonetheless, defendant argues that when Moore, lying mortally wounded on a sidewalk, spoke to his two friends, he must have believed that his identification of defendant would enable the police to investigate and prosecute him. Suffice it to say that how his statements might be used in a police investigation and prosecution could not have been uppermost in Moore's mind at that moment.

Similarly, the statement to Officer McDermott was not testimonial. While Moore's statement was in response to McDermott's question, that solitary inquiry, posed to Moore in the course of a fast-moving on-the-scene crime investigation, is hardly the sort of structured police investigation to which *Crawford* is directed. As in *Nieves-Andino*, Officer McDermott, responding to the scene of a shooting that had just occurred, could not have been certain that the assailant posed no further threat to the victim or the onlookers. Clearly, the statement was elicited as in *Nieves-Andino*, as part of an attempt "to assess what had happened to cause [the victim's] injuries and whether there was any continuing danger to the others in the vicinity" (9 NY3d at 16), and not merely to learn what had happened in the past. In any event, given the unassailably correct admission of Moore's statements to Haywood and Pinkston, respectively, it is clear that Officer McDermott's testimony as to Moore's statement to her could have had no impact on the verdict.

We have examined defendant's other contentions and find them without merit.

Accordingly, the judgment of Supreme Court, New York County (Michael J. Obus, J.), rendered September 13, 2005, convicting defendant, after a jury trial, of murder in the second degree, and sentencing him to a term of 22 years to life, should be affirmed.

LIPPMAN, P.J., FRIEDMAN, GONZALEZ and CATTERSON, JJ., concur.

Judgment, Supreme Court, New York County, rendered September 13, 2005, affirmed.