■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICKY OWENS, Appellant. [7 NYS3d 128]—

Judgment, Supreme Court, Bronx County (Cassandra M. Mullen, J.), rendered August 16, 2010, as amended August 27, 2010, convicting defendant, after a jury trial, of manslaughter in the first degree and criminal possession of a weapon in the third degree, and sentencing him, as a second violent felony offender, to an aggregate term of 17 years, unanimously modified, on the law, to the extent of reducing the sentence for criminal possession of a weapon to a term of 3½ to 7 years, and otherwise affirmed.

Overwhelming evidence supports the verdict against defendant. Unbiased eyewitness Jaime Lopez testified that he saw the fatal shooting of Jose Ibanez on December 28, 2006 at approximately 2:15 p.m., and he identified defendant as the attacker. Detective Luis Aponte, who arrived at the scene soon thereafter and gathered information from Lopez and other witnesses, testified that the day after the shooting he received a phone call from Ibanez's girlfriend, Sheila Sanchez, and later spoke with her in person.

Sanchez testified at trial about an incident that occurred almost two months before the shooting, on October 31, 2006, at about 2:30 p.m. She and her six-year-old son were in a costume store with Ibanez, when Ibanez was approached from behind by two black men, one who was shorter, more muscular, and had a lighter complexion than his companion. The shorter man asked, "[H]ey Ibanez, do you remember me?" When Ibanez turned around, extending his hand for a handshake, this man began to punch him, and the taller man joined in the attack. After Sanchez told the owner of the store to call the police, the two men left the store. Three or four minutes after they left, Ibanez made a telephone call. According to Sanchez's testimony, when she was interviewed the day after Ibanez was killed, she told the police about the Halloween incident, including a description of the phone call. She did not name in her testimony the person whom she believed Ibanez had called.

Sanchez subsequently identified defendant's brother, Jason Owens, as the taller and less muscular of the two attackers. She did not identify the shorter man, who said, "[H]ey Ibanez, do you remember me?"

Detective Aponte testified that as a result of his conversa-

tions with Sanchez, he contacted the victim's cousin, Robert Pellerano, and that as a result of his conversations with Pellerano and some further investigation, he arrested defendant.

Robert Pellerano testified that starting in about February 1998, he and his cousin Jose Ibanez were both housed in a unit of Rikers Island, while defendant arrived at the same unit in November 1998. Pellerano explained that Ibanez was the self-appointed "owner of the house," meaning that he "r[a]n" the area, and all other inmates had to either obey his orders or be subject to negative repercussions. Pellerano testified that in late December 1998 or early January 1999, a fight was supposed to take place between Ibanez and another inmate, for which defendant was asked to act as a "holster" for Ibanez, assigned to "get a shank" and provide it to Ibanez if Ibanez requested it. However, when the time came for the fight, defendant failed to obtain the weapon. Later, in front of the entire housing area, Ibanez kicked defendant in the face and tried to cut him, but could not complete his attack because "[t]hey made us lock in," but defendant was left crying in front of his cell, in view of the other inmates.

Pellerano and Ibanez were both released from Rikers Island in April 1999. When Pellerano subsequently returned to the same unit in June of 2000, it was defendant who was "running" that prison area. Pellerano and defendant had a fight on one occasion, during which defendant was "trash talking" about Pellerano and Ibanez.

Pellerano was permitted to testify that he received a phone call from Ibanez on Halloween 2006, at approximately 2:30 or 3:00 p.m., and that the "name mentioned between [him] and Jose Ibanez" during the call was "Ricky Owens." Pellerano further testified that he relayed to Detective Aponte the conversation he had with Ibanez on Halloween 2006.

Detective Aponte also established that defendant was paroled from state custody on October 26, 2006, five days before the assault in the costume store.

Defendant contends that the part of Pellerano's testimony conveying that during Ibanez's telephone call to him, Ibanez told him that defendant was one of his assailants, was inadmissible both as violative of the Confrontation Clause and as hearsay.

Initially, we observe that the challenged testimony does not fall within the ambit of the Confrontation Clause because it was not "testimonial" (*see e.g. People v Gantt*, 48 AD3d 59, 69-71 [1st Dept 2007], *lv denied* 10 NY3d 765 [2008]). However, the hearsay nature of Pellerano's testimony relating Ibanez's

out-of-court statement to Pellerano identifying defendant as his assailant—either by name or by an identifying description that allowed Pellerano to name him—was not remedied by framing the query posed to Pellerano as seeking the "name mentioned between you and Jose Ibanez" during the call.

We do not adopt the trial court's reasoning that the admission of this hearsay evidence was necessary to convey a coherent narrative of the relevant events or to eliminate the possibility of jury confusion about the extent of Pellerano's knowledge (see People v Beato, 124 AD3d 516 [1st Dept 2015]). However, we find that the error was harmless under the applicable standard of People v Crimmins (36 NY2d 230, 242 [1975]), which provides that error is reversible where "there is a significant probability, rather than only a rational possibility, in the particular case that the jury would have acquitted the defendant had it not been for the error or errors which occurred." We perceive no such probability that the jury would have acquitted without that challenged portion of Pellerano's testimony. The admissible evidence included Lopez's eyewitness identification, along with Pellerano's testimony regarding defendant's humiliation at Ibanez's hands on Rikers Island, and the recovery of the murder weapon in defendant's brother's room. Further, even without the hearsay there was strong evidence that defendant was the second Halloween attacker, namely, a physical description consistent with defendant's appearance; the evidence that the assailant asked Ibanez if he "remembered" him; and the identification of defendant's brother as the second man who assaulted Ibanez. Indeed, the overwhelming evidence would satisfy the constitutional harmless error standard as well.

As to the trial court's admission of testimony suggesting inferentially that the eyewitness identified defendant from a photo array, any error in that regard was harmless.

Defendant's claim pursuant to CPL 270.35 (1) and People v Buford (69 NY2d 290, 298 [1987]) is unpreserved in light of his failure to request that the court make inquiry of the possibly unqualified jurors, despite having had ample opportunity to do so (see People v Hicks, 6 NY3d 737, 739 [2005]; People v Gonzalez, 247 AD2d 328, 328-329 [1st Dept 1998]), and we decline to review it in the interest of justice.

The court did not err in submitting the charge of manslaughter in the first degree to the jury; there was a reasonable view of the evidence under which defendant intended to seriously injure the victim, but not to kill him.

Finally, it is undisputed that the seven-year term imposed

for the weapon possession count was illegal. The People agree with defendant that, as reflected on the original and amended sentence and commitment sheets, the court mistakenly believed that defendant was convicted of criminal possession of a weapon in the second degree—and sentenced him accordingly—when in fact he was convicted of criminal possession of a weapon in the third degree. However, because a concurrent sentence was imposed on the weapon possession charge, its alteration will not affect defendant's aggregate sentence. Accordingly, rather than remanding for re-sentencing on the third-degree weapon possession count, this Court simply modifies the sentence so as to impose the minimum term of $3^{1}/_{2}$ to 7 years on that count. Concur—Sweeny, J.P., Andrias, Saxe, DeGrasse and Gische, JJ.