[872 NE2d 1188, 840 NYS2d 882]

The People of the State of New York, Respondent, v Juan Nieves-Andino, Also Known as Juan Andino-Nieves, Appellant.

Argued June 6, 2007; decided June 28, 2007

## POINTS OF COUNSEL

*Center for Appellate Litigation,* New York City (*Jonathan M. Kirshbaum* and *Robert S. Dean* of counsel), for appellant. The victim's on-the-scene statement to a police officer, which was made after the incident was over and the assailant had left the scene, and which described in detail the past criminal conduct, was testimonial and barred under the Sixth Amendment pursuant to the Supreme Court's decision in *Davis v Washington* (547 US 813 [2006]). (*Crawford v Washington,* 541 US 36; *Lawrence v Chater,* 516 US 163; *People v Watson,* 14 Misc 3d 942; *United States v Clemmons,* 461 F3d 1057; *Matter of German F.,* 13 Misc 3d 642; *People v Bradley,* 8 NY3d 124; *People v Nieves,* 67 NY2d 125.)

*Robert T. Johnson, District Attorney,* Bronx (*Allen H. Saperstein, Joseph N. Ferdenzi* and *Nancy D. Killian* of counsel), for respondent. Defendant's claim that the statements were testimonial since there was no ongoing emergency is unpreserved for this Court's review; nor can he establish that, as a matter of law, no emergency situation existed where the seriously wounded shooting victim lay sprawled on the street, and the police arrived a scant 15 minutes after the shooting. (*People v Bradley,* 8 NY3d 124; *People v Kelly,* 56 NY2d 873; *People v Molnar,* 98 NY2d 328; *People v Knowles,* 88 NY2d 763; *People v Lyons,* 81 NY2d 753; *People v Baumann & Sons Buses, Inc.,* 6 NY3d 404; *People v Gray,* 86 NY2d 10; *People v Tutt,* 38 NY2d 1011; *United States v Clemmons,* 461 F3d 1057; *Lawrence v Chater,* 516 US 163.)

## OPINION OF THE COURT

PIGOTT, J.

Jose Millares was shot in the early hours of November 28, 2000 on the Bronx street where he sold drugs. His associate Michael O'Carroll called 911. Within minutes, two police officers arrived on the scene, and immediately went to Millares, who was lying, half on the street, half on the sidewalk, between two parked cars. There was a small crowd of onlookers. Officer Doyle bent down to observe the victim more closely. He was bleeding

and grimacing with pain. As soon as Officer Doyle had summoned an ambulance, he spoke with Millares, who replied in a low voice. The officer asked for, and Millares gave, his name, address and phone number. The officer then asked Millares what had happened. Millares responded that he had argued with a man named Bori, who had shot him three times, and he told the officer Bori's address. Officer Riordan, meanwhile, searched the location for shell casings, finding four discharged casings from a .380 caliber pistol.

O'Carroll had witnessed the shooting and, after Millares died of his injuries, he informed the police that he had seen defendant Juan Nieves-Andino, who was known as Bori, shoot Millares. O'Carroll knew defendant, who had sold drugs for Millares; in 1999, defendant apparently ventured out on his own, and the two men quarreled.

After being apprehended in Puerto Rico and returned to New York, defendant was charged with second-degree murder and other crimes. He moved in limine for an order excluding, as hearsay, Millares's statement that he had been shot by a man named Bori. Citing *Crawford v Washington* (541 US 36 [2004]), defendant argued that admission of the statement would violate his Sixth Amendment right to confront a witness against him. The People responded that the statement was admissible as an excited utterance and that its admission would not violate the Sixth Amendment. Supreme Court agreed with the People.

At trial, Officer Doyle testified that Millares told him he had been shot by a man named Bori, and that Millares had told him where Bori lived. O'Carroll testified that he saw defendant approach Millares, pull a .380 caliber pistol from the pouch of his "hoodie," and fire four or five shots at Millares, before running away. In addition, autopsy evidence indicated that the cause of death was complications from a gunshot wound. The jury convicted defendant of second-degree murder.

The Appellate Division agreed with Supreme Court that defendant's right of confrontation was not violated by the admission of Millares's response to the officer's questioning. A Judge of this Court granted leave to appeal, and we now affirm.

Our decision is guided by *Crawford v Washington* (541 US 36 [2004]) and *Davis v Washington* (547 US 813 [2006]). In those cases, the Supreme Court held that the Federal Confrontation Clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a

prior opportunity for cross-examination" (*id.* at 821). Only statements that are testimonial make the absent declarant a "witness" within the meaning of the Confrontation Clause (*see id.*). In *Davis*, the Supreme Court explained that statements made in response to police inquiries are *not* testimonial when the circumstances "objectively indicat[e] that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" (*id.* at 822).

Last year, in *People v Bradley* (8 NY3d 124 [2006]), we had occasion to apply the "primary purpose of the interrogation" analysis set forth in *Davis* to a statement, made by a woman to a police officer, that her boyfriend had assaulted her. The officer testified that, following a 911 call, he arrived at the door of an apartment to find the shaken woman who was bleeding profusely and walking with a limp. He asked her what had happened and she said her boyfriend had thrown her through a glass door. The officer then found the defendant in the apartment and observed a broken glass door. We held that "defendant's right of confrontation was not violated by the admission into evidence of a statement made in response to a question from a police officer, where the officer's evident reason for asking the question was to deal with an emergency" (8 NY3d at 125). Because the victim's "statement was made when the officer could reasonably have assumed, and apparently did assume, that he had an emergency to deal with" (8 NY3d at 128), it was not testimonial.

Defendant argues that when the assailant, having left the crime scene, no longer poses a physical threat to the victim, the primary purpose of a police officer's questioning of the victim cannot be to meet an ongoing emergency. We do not believe that *Davis* imposed such a restricted interpretation of what constitutes a continuing emergency. Whether an officer's primary reason for making an inquiry was to deal with an emergency is a fact-based question that must necessarily be answered on a case-by-case basis. Even when the assailant has fled, the circumstances of the police officer's questioning of the victim may objectively indicate that the officer reasonably assumed an ongoing emergency and acted with the primary purpose of preventing further harm.

Officer Doyle arrived at the scene of a recent shooting and, as soon as he had summoned medical help, asked the victim what had happened. Given the speed and sequence of events, the offi-

cer could not have been certain that the assailant posed no further danger to Millares or to the onlookers. His brief solicitation of pedigree information and information about the attacker's identity was part of Officer Doyle's reasonable efforts to assess what had happened to cause Millares's injuries and whether there was any continuing danger to the others in the vicinity. In other words, the primary purpose of his inquiry was to find out the nature of the attack, "so that he could decide what, if any, action was necessary to prevent further harm" (*Bradley*, 8 NY3d at 127). "[T]he nature of what was asked and answered . . . viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past" (*Davis*, 547 US at 827). In short, Officer Doyle, like the officer in *Bradley*, reasonably assumed that there was an ongoing emergency. It follows that Millares's responses to Officer Doyle's inquiries were nontestimonial (*see Bradley*, 8 NY3d at 128) and that their admission did not implicate defendant's right to confrontation.

Contrary to defendant's urging, Officer Doyle's questioning of Millares is distinguishable from the interrogation in the companion case to *Davis*, *Hammon v Indiana*, in which the Supreme Court held that the victim's statement was testimonial. In *Hammon*, the officers questioned a husband and wife in separate rooms following a report of domestic disturbance, and the wife filled out a battery affidavit (*see Davis*, 547 US at 820). The husband remained under the control of the police during the wife's questioning in *Hammon*, so that the police knew that the emergency had ended when they began their inquiries. By contrast, Officer Doyle had no knowledge of the assailant's whereabouts when he began questioning Millares.

Our holding today is also consistent with the Supreme Court's dictum in *Davis* that statements made by a victim of domestic violence to a 911 operator might be testimonial if they were made after the victim told the operator that the assailant had fled (*see Davis*, 547 US at 828-829). When a 911 operator or a police officer justifiably believes that the assailant no longer poses a threat to the victim, the purpose of his or her interrogation of the victim may "evolve" from dealing with an ongoing emergency to establishing past events with a view to later criminal prosecution (*see Davis*, 547 US at 828). On this record, however, the initial purpose of Officer Doyle's inquiry did not change.

Accordingly, the order of the Appellate Division should be affirmed.

JONES, J. (concurring). I agree with the majority that the Appellate Division's order upholding defendant's conviction should be affirmed, and that Millares's statements regarding his pedigree information were nontestimonial. I write separately, however, because the circumstances objectively indicate that Millares's statements concerning defendant's identity, address and past conduct were not elicited by an interrogation designed to assist Officers Doyle and Riordan in meeting an ongoing emergency. To the contrary, they indicate that the primary purpose of the interrogation was to establish or prove past events potentially relevant to a later criminal prosecution. Accordingly, these statements were testimonial under *Crawford v Washington* (541 US 36 [2004]) and *Davis v Washington* (547 US 813 [2006]), and defendant's right of confrontation was violated when the trial court admitted these statements. Nevertheless, I conclude that this error was harmless beyond a reasonable doubt.

I

Officers Doyle and Riordan both testified that on November 28, 2000, at about 4:14 A.M., they received a distress call over their radio stating that a man had been shot at 176th Street and Clay Avenue in the Bronx. Upon arriving at that location, both police officers exited their vehicle. Officer Doyle testified that he "went over to the victim, who was laying down." Officer Riordan provided more detail as to what he and Officer Doyle did as they exited their vehicle. At trial, the following exchange took place:

> "[PEOPLE]: What, if anything, did you observe your partner do after you parked your car?
>
> "[OFFICER RIORDAN]: Both my partner and myself walked over towards the crowd and I looked down and I saw a male laying down on the sidewalk.
>
> "[PEOPLE]: What did your partner do?
>
> "[OFFICER RIORDAN]: My partner kneeled down next to the person laying down . . . .
>
> "[PEOPLE]: What did you notice about the person, what else?

"[OFFICER RIORDAN]: He was moaning loudly. I believe I heard people in the crowd, one or two saying, you know, that he was shot.

"[PEOPLE]: Okay. And what, if anything, did you do?

"[OFFICER RIORDAN]: Well, upon hearing that[,] I immediately turned around and turned my flashlight on and started looking on the ground around the general area for any shell casings."

Officer Riordan also testified that he left Officer Doyle with Millares.

Before speaking to Millares, Officer Doyle had an opportunity to observe that Millares was conscious, bleeding and grimacing in pain. Officer Doyle, who was trained to administer CPR, determined that he could not render any medical assistance to Millares. At trial, he was asked why he could not render medical assistance, to which he responded: "For the seriousness of his injury, I'm not trained to give assistance. I could make things worse." Instead, Officer Doyle "called for an ambulance to respond to [a] man shot." After calling the ambulance, Officer Doyle, who testified that he "wanted to get some information from [Millares]," bent down on one knee and began to question Millares. Officer Doyle asked Millares for pedigree information (his name, age, address and phone number) and then asked what happened. According to Officer Doyle's testimony, Millares said he had an argument with defendant (whom he identified by his nickname "Bori") and "Bori shot him three times." Millares also gave Officer Doyle specific information about where defendant resided. The following testimony was elicited at trial:

"[PEOPLE]: Did the victim ever tell you where this person Bori lived?

"[OFFICER DOYLE]: I don't recall. I can't remember.

"[PEOPLE]: Would something refresh your memory?

"[OFFICER DOYLE]: Yes, yes.

"[PEOPLE]: I ask the witness be shown this piece of paper. . . .

"[PEOPLE]: Does that refresh your recollection?

"[OFFICER DOYLE]: Yes.

"[PEOPLE]: And did the victim, Jose Millares, indicate to you where this person Bori lived?

"[OFFICER DOYLE]: Yes.

"[PEOPLE]: Where was that?

"[OFFICER DOYLE]: 1818 Clay Avenue, Apartment 1A."

After the ambulance came and went, Officer Doyle put up crime scene tape and cordoned off the area. When the detectives arrived on the scene, he gave them the information he had received from Millares.

## II

The question before this Court is whether, objectively considered, Officer Doyle's questioning of Millares produced testimonial statements. As explained by the Supreme Court in *Davis*, "[statements] are testimonial when the circumstances *objectively* indicate that there is no . . . ongoing emergency, and that the *primary purpose* of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution" (547 US at 822 [emphasis added]). Here, it is clear from the facts and circumstances that Officer Doyle's interrogation of Millares was part of an investigation into past criminal conduct. One need only consider the actions of Officers Doyle and Riordan upon arriving on the scene to determine that they were not faced with an ongoing emergency or a concern of a future attack by the assailant (nor was there any indication that the assailant was still on the scene).

Right after Officers Doyle and Riordan came upon the crime scene, Officer Riordan immediately began to look for and recover evidence. Officer Doyle, on the other hand, initially sought to ensure Millares's safety. Although Officer Doyle could not render medical assistance to Millares, he called an ambulance. However, as soon as he made that call, he could do nothing further for Millares except find out Millares's pedigree information, which could assist the ambulance workers, and stay with him until the ambulance arrived. At this point, although Millares was in extremis, Officer Doyle's focus properly shifted from managing an emergency to investigating a past crime and gathering key information such as where defendant resided. Put differently, because it was objectively apparent that the emergency (i.e., the threat from the assailant) had passed, when Officer Doyle asked "what happened," he was not trying to determine "what is happening." Unlike the police officer in *People v Bradley* (8 NY3d 124 [2006]), Officer Doyle asked "what

happened" not as a means of finding out what caused Millares's injuries or determining what action needed to be taken in order to prevent further harm to Millares. Officer Doyle already had the answers to those questions before he spoke to Millares.

Thus, Officer Doyle's interrogation of Millares regarding the crime committed against him, although completely appropriate and necessary, elicited testimonial statements—i.e., statements one would expect a witness to make at trial—which are subject to the constraints of the Confrontation Clause. As stated by the *Davis* Court:

> "Police investigations themselves are, of course, in no way impugned by our characterization of their fruits as testimonial. Investigations of past crimes prevent future harms and lead to necessary arrests. While prosecutors may hope that inculpatory 'non-testimonial' evidence is gathered, this is essentially beyond police control. Their saying that an emergency exists cannot make it be so. The Confrontation Clause in no way governs police conduct, because it is the trial *use* of, not the investigatory *collection* of, *ex parte* testimonial statements which offends that provision. But neither can police conduct govern the Confrontation Clause; testimonial statements are what they are" (547 US at 832 n 6).

Recognizing that police officers at a crime scene may shift their focus from addressing an emergency to conducting an investigation, *Davis* and *Bradley* contemplate that police interrogations can yield nontestimonial and/or testimonial statements based on the circumstances of the particular case.* Here, the majority's view—that all of the statements made by Millares to Officer Doyle were nontestimonial—fails to follow the Supreme Court's holding in *Davis* that what "the circumstances objectively indicate" about the purpose of a particular interrogation is controlling. The circumstances in this case do not objectively indicate that the primary purpose of the interrogation was at all times to assist the police in dealing with an ongoing emergency. In fact, the very existence of an ongoing emergency is belied by the trial testimony of Officers Doyle and Riordan, as well as their collective conduct at the crime scene.

---

* Accordingly, defendant's unduly restrictive view of what constitutes an ongoing emergency (*see* majority op at 15) is unavailing.

### III

Violations of a criminal defendant's Sixth Amendment right of confrontation are subject to a constitutional harmless error analysis (*see People v Eastman*, 85 NY2d 265, 276 [1995]). Unless the People show that the error is "harmless beyond a reasonable doubt," such error requires reversal of the conviction and a new trial (*Eastman*, 85 NY2d at 276). "Such errors are considered harmless when, in light of the totality of the evidence, there is no reasonable possibility that the error affected the jury's verdict" (*People v Douglas*, 4 NY3d 777, 779 [2005], citing *People v Crimmins*, 36 NY2d 230, 240-241 [1975]). In deciding whether the People have met their burden for establishing harmlessness, a reviewing court must "consider both the overall strength of the case against defendant and the importance [of the improperly admitted evidence to that case]" (*People v Goldstein*, 6 NY3d 119, 129 [2005]).

Here, although it was error to admit Millares's statements concerning defendant's identity, address and past conduct, there was no reasonable possibility that the error contributed to defendant's conviction. O'Carroll's testimony at trial described the shooting in great detail. Further, much of O'Carroll's testimony was corroborated by other evidence presented at trial. For example, O'Carroll testified that defendant, a man he knew very well, drew a .380 caliber automatic pistol from his "hoodie" pocket and fired three shots at Millares. According to O'Carroll, Millares fell wounded, but defendant kept firing until the weapon jammed. O'Carroll's description of how defendant "unjammed" the pistol was corroborated by the People's ballistic expert at trial. O'Carroll also detailed how defendant stood "[r]ight on top of [Millares]" and twice fired his gun again after the wounded victim had fallen to the ground and crawled a few feet. One of the two bullets fired by defendant ricocheted off the floor of nearby truck and also hit Millares. O'Carroll's testimony on this point was corroborated by the medical examiner who testified that the three bullet wounds sustained by the victim were consistent with a gunman standing over a prostrate victim and pointing the gun down at him. O'Carroll also testified that after the shooting, he saw Millares bleeding from the back. According to the medical examiner, Millares was shot in the back.

In light of O'Carroll's testimony and the corroborating evidence presented at trial, there was no reasonable possibility that the trial court's erroneous admission of the above-mentioned statements influenced the jury's verdict. Thus, the

People have met their burden for establishing that the error was harmless beyond a reasonable doubt.

Chief Judge KAYE and Judges GRAFFEO and READ concur with Judge PIGOTT; Judge JONES concurs in result in a separate opinion in which Judges CIPARICK and SMITH concur.

Order affirmed.