14

[926 NYS2d 598]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THOMAS CLAY, Appellant.

Second Department, June 28, 2011

**APPEARANCES OF COUNSEL**

*Lynn W. L. Fahey*, New York City (*Denise A. Corsi* of counsel), for appellant.

*Charles J. Hynes, District Attorney*, Brooklyn (*Leonard Joblove, Howard B. Goodman* and *Melissa J. Feldman* of counsel), for respondent.

**OPINION OF THE COURT**

SKELOS, J.P.

The principal issues presented on this appeal are whether a statement uttered by a victim of a shooting shortly before his death, in response to an inquiry by a police officer regarding the identity of the shooter, constituted testimonial evidence, which is generally barred by the Confrontation Clause of the Sixth Amendment of the United States Constitution, and, if so, whether such evidence was admissible as a constitutionally permissible exception to the Confrontation Clause. We hold that, under the circumstances of this case, the victim's words

were testimonial, but they constituted a "dying declaration" and, thus, were admissible as an exception to the Confrontation Clause.

At approximately 9:00 P.M. on August 11, 2006, Igol Isaacs was shot on a street in Brooklyn. Police Captain Brian McGee responded to a radio call seeking assistance at the scene of the shooting. When McGee arrived at that location, there were other officers and a police van already present. McGee observed Isaacs lying face-up on the sidewalk, and a police officer with him. Without speaking with the other officers, McGee approached Isaacs, who was gasping for air. McGee knelt down beside him and asked, "Who shot you?" Receiving no response, McGee then stated to Isaacs: "I don't think you're going to make it. Who shot you?" The victim responded, saying what McGee heard as "Todd shot me." When McGee sought to confirm "Todd shot you," the victim stated "[N]o. No. Tom shot me. Tom. Tom." McGee "kept asking" Isaacs "Tom, who?" but, according to McGee, it was difficult for Isaacs to breathe and he was unable to speak any further. After McGee spoke with Isaacs, he had a conversation with another officer, but did not tell the other officer what Isaacs had said. McGee then began pushing back a crowd of people who had assembled, and set out to "preserve the crime scene." Isaacs died at the hospital sometime the same night. An autopsy revealed that he had six gunshot wounds. The police recovered from the scene one discharged .45 caliber shell casing and seven discharged 9 millimeter shell casings found to have been fired from the same gun.

On the same night, the police were contacted by Yvette Clay, who indicated that she had witnessed the shooting. She identified the shooters as the appellant, Thomas Clay, who was her estranged husband, and his cousin, the codefendant Sidor Fulcher. The appellant and Fulcher each were subsequently indicted on one count of murder in the second degree, among other offenses, and were jointly tried before a jury. Prior to McGee's testimony, the People sought a ruling as to whether he would be permitted to testify to the statements made to him by Isaacs. Counsel for both defendants objected to the admission of the hearsay evidence on the ground that it would violate the defendants' rights under the Sixth Amendment as interpreted in *Crawford v Washington* (541 US 36 [2004]). The People countered that the testimony was not barred by the Confrontation Clause because it was not testimonial, and that it was admissible as a dying declaration. The Supreme Court agreed

with the People, and McGee was permitted to testify to the statements made to him by Isaacs.

In addition to McGee's testimony, the People presented the testimony of Yvette Clay, and the testimony, given under a cooperation agreement with the People, of another eyewitness who had been talking to Isaacs when the shooting occurred. Both of these witnesses identified the appellant and Fulcher as the shooters. The jury convicted both defendants of murder in the second degree. The appellant contends that it was constitutional error to permit McGee to testify to Isaacs's identification of "Tom" as the shooter. We disagree, and affirm the judgment.

The Sixth Amendment to the United States Constitution provides, in relevant part: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The same right is protected under article I, § 6, of the New York Constitution. In *Crawford*, the United States Supreme Court "explicitly rejected as unfaithful to the original meaning of the Confrontation Clause its prior test in *Ohio v Roberts* (448 US 56 [1980]), which admitted out-of-court statements 'so long as [they had] adequate indicia of reliability— i.e., [fell] within a firmly rooted hearsay exception' " (*People v Rawlins*, 10 NY3d 136, 150 [2008], *cert denied* 557 US —, 129 S Ct 2856 [2009] [internal quotation marks omitted], quoting *Crawford*, 541 US at 42). The Supreme Court replaced that test with one which assesses whether the statement to be admitted is "testimonial" (*Crawford*, 541 US at 68; *see Davis v Washington*, 547 US 813, 821 [2006]). "Only statements of this sort," the Court reasoned, "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause" (*Davis*, 547 US at 821; *see Crawford*, 541 US at 68). Such testimonial evidence is therefore barred unless the declarant is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination (*see Davis*, 547 US at 821; *Crawford*, 541 US at 68).

The Supreme Court declined to form "a comprehensive definition of 'testimonial,' " but recited "[v]arious formulations" of that class of statements, which included "pretrial statements that declarants would reasonably expect to be used prosecutorially" (*Crawford*, 541 US at 51, 68). Further, the Court observed, "[s]tatements taken by police officers in the course of interrogations" were testimonial "under even a narrow standard" (*id.* at 52). In making this latter observation, however, the Court "had immediately in mind" (*Davis*, 547 US at 826) the police

"questioning that generated the deponent's statement in *Craw-ford*—which was made and recorded while she was in police custody, after having been given *Miranda* warnings" (*Davis*, 547 US at 822). In *Davis v Washington*, the Supreme Court had occasion to consider whether statements made to law enforcement personnel during 911 calls and at a crime scene were testimonial, and in so doing, to "determine more precisely," though not exhaustively, "which police interrogations produce testimony" (*id.*). It held:

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution" (*id.*).

Applying this principle to the circumstances before it, the Supreme Court concluded that an interrogation that took place during the course of a 911 call did not produce testimonial statements (*id.* at 826; *see People v Phillips*, 68 AD3d 1137 [2009] [admission of recorded 911 calls in which a nontestifying complainant sought help in an ongoing emergency situation did not violate Sixth Amendment]; *People v Ward*, 57 AD3d 582, 583 [2008]; *People v Drummond*, 34 AD3d 492, 492-493 [2006]; *People v Conyers*, 33 AD3d 929, 930 [2006]). In so concluding, the Court reasoned that the declarant "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events,' " and that the nature of the inquiry reflected that the "elicited statements were necessary to be able to *resolve* the present emergency" (*Davis*, 547 US at 827). Simply stated, the declarant "was not acting as a *witness*," for "[n]o 'witness' goes into court to proclaim an emergency and seek help" (*id.* at 828).

The Court recognized, however, that an interrogation aimed at determining the need for emergency assistance could, once that purpose was achieved, evolve into an investigation into past events so as to produce testimonial statements. That point was reached in the companion case to *Davis*, *Hammon v Indiana* (547 US 813, 819 [2006]), in which the police, responding to a reported domestic disturbance, initially came upon a " 'some-

what frightened' '' woman on the front porch of her home. The woman reported that " 'nothing was the matter,' " but gave the officers permission to enter the home, where they found her husband sitting calmly in the kitchen (*id.*). Some of the officers then questioned the wife in a separate room from the husband while other officers remained with the husband, and prevented him from interfering in the questioning of the wife (*id.* at 819-820). The Court held that when the officers questioned the wife for the second time, i.e., in the house, separated from her husband, the "primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime" (*id.* at 830). Thus, the Court concluded, the statements made by the wife during that second interrogation were testimonial (*id.*).

"The lodestar, then, that emerges from *Davis* is the *purpose* that the statement was intended to serve" (*People v Rawlins*, 10 NY3d at 148; *see People v Duhs*, 16 NY3d 405 [2011]). Our Court of Appeals has since had the opportunity to apply *Davis*'s " 'primary purpose' test" (*People v Duhs*, 16 NY3d at 409) in two cases which fell between the poles of *Davis* and *Hammon*. In *People v Bradley* (8 NY3d 124, 125-126 [2006]), a police officer, responding to a 911 call, arrived at the door of an apartment, where he was met by a woman who "was visibly shaken, had blood on her face and clothing, was bleeding profusely from one hand, and walked with a noticeable limp." The officer asked her " 'what happened,' " and she responded that the defendant had thrown her through a glass door (*id.* at 126). The Court held that this latter statement was not testimonial because "the officer's evident reason for asking the question was to deal with an emergency" (*id.* at 125). The Court reasoned that the officer's "immediate task was to find out what had caused the injuries so that he could decide what, if any, action was necessary to prevent further harm" (*id.* at 127). Asking " 'what happened' was a normal and appropriate way to begin that task, and the officer promptly entered the apartment, as an officer dealing with an emergency would be expected to do" (*id.*). Accordingly, the Court held that the challenged statement was properly admitted at trial (*id.* at 126).

After *Bradley*, the Court decided *People v Nieves-Andino* (9 NY3d 12 [2007]), which presents circumstances closer to those at issue here. In that case, in response to a 911 call, two police officers arrived on the scene of a recent shooting, where they encountered the victim, lying half on the street, half on the sidewalk, between two parked cars (*id.* at 13). The officers im-

mediately summoned an ambulance, and then one of the officers asked the victim for his name, address, and telephone number (*id.* at 14). The officer then asked the victim what had happened, to which the victim responded that a man named Bori had shot him three times (*id.*). The Court held that the admission of this identification evidence did not violate the defendant's confrontation rights. It concluded that the officer had reasonably assumed that there existed an ongoing emergency, despite the fact that the assailant had fled, and that "the primary purpose of his inquiry was to find out the nature of the attack, 'so that he could decide what, if any, action was necessary to prevent further harm' " (*id.* at 16, quoting *People v Bradley*, 8 NY3d at 127).

Most recently, in *Michigan v Bryant* (562 US —, 131 S Ct 1143 [2011]), the United States Supreme Court was faced with a Confrontation Clause issue arising in circumstances similar to those presented to the Court of Appeals in *Nieves-Andino.* In *Bryant*, police officers responding to "a radio dispatch indicating that a man had been shot," arrived at the scene to find the victim lying on the ground in a gas station parking lot, with a gunshot wound to his abdomen (562 US at —, 131 S Ct at 1150). They approached the victim and asked "What happened?," to which the victim's response was "either 'Rick shot me' or 'I was shot,' followed very quickly by an identification of 'Rick' as the shooter" (562 US at —, 131 S Ct at 1165). "In response to further questions, [the victim] explained that the shooting occurred through the back door of [the defendant's] house and provided a physical description of the shooter" (*id.*). The victim died within hours, and the police officers who spoke with him were permitted to testify to his statements to them regarding the shooting and the perpetrator (562 US at —, 131 S Ct at 1150). The Supreme Court of Michigan concluded that these statements constituted testimonial hearsay (562 US at —, 131 S Ct at 1151). The United States Supreme Court disagreed, and took the opportunity to provide "additional clarification" of *Davis*'s "primary purpose" test (562 US at —, —, 131 S Ct at 1150, 1156).

To begin with, the Court reiterated, the "primary purpose" test is objective (562 US at —, 131 S Ct at 1156). "That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and

the circumstances in which the encounter occurred" (*id.*). With respect to "the circumstances in which the encounter occurred," the Court indicated that the existence of an ongoing emergency was "among the most important" (562 US at —, 131 S Ct at 1156-1157). "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry" (562 US at —, 131 S Ct at 1158), it explained, "depend[ing] on the type and scope of danger posed to the victim, the police, and the public" (562 US at —, 131 S Ct at 1162).[1] As to the "statements and actions" of the participants, "a combined inquiry that accounts for both the declarant and the interrogator" is warranted (562 US at —, 131 S Ct at 1160). The Court explained:

> "In many instances, the primary purpose of the interrogation will be most accurately ascertained by looking to the contents of both the [interrogator's] questions and the [declarant's] answers. To give an extreme example, if the police say to a victim, 'Tell us who did this to you so that we can arrest and prosecute them,' the victim's response that 'Rick did it,' appears purely accusatory . . . by virtue of the phrasing of the question" (562 US at —, 131 S Ct at 1160-1161).

Applying those principles to the case before it, the Court concluded that an ongoing emergency existed (562 US at —, —, 131 S Ct at 1164, 1166). Further, "[f]rom [the] description of [the victim's] condition and the report of his statements," including that his statements "were punctuated with questions about when emergency medical services would arrive," the Court could not conclude that "a person in [the victim's] situation" would have had the primary purpose of providing evidence for a later criminal prosecution (562 US at —, 131 S Ct at 1165). Finally, the Court determined that "[t]he questions [the police officers] asked—'what had happened, who had shot him, and where the shooting occurred'—were the exact type of questions necessary to allow the police to 'assess the situation, the threat to their own safety, and possible danger to the potential victim' and to the public" (562 US at —, 131 S Ct at 1166

---

1. Another relevant circumstance identified by the Court was the formality or informality of the encounter (*Bryant*, 562 US —, —, 131 S Ct 1143, 1160 [2011]). However, the Court acknowledged that "informality does not necessarily indicate . . . the lack of testimonial intent" and recognized that the right to confrontation cannot be evaded by deliberately keeping an interrogation informal (562 US at —, 131 S Ct at 1160, citing *Davis*, 547 US at 822).

[internal quotation marks and citations omitted]). Accordingly, "[b]ecause the circumstances of the encounter as well as the statements and actions of [the victim] and the police objectively indicate[d] that the 'primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency,'" the Court held that the victim's statements were not testimonial hearsay (562 US at —, 131 S Ct at 1166-1167).

As the analysis in *Bryant* demonstrates, whether the primary reason for the interrogation was to deal with an emergency or to "creat[e] an out-of-court substitute for trial testimony" (562 US at —, 131 S Ct at 1155) "is a fact-based question that must necessarily be answered on a case-by-case basis" (*Nieves-Andino*, 9 NY3d at 15; *see Rawlins*, 10 NY3d at 147). Unlike the Supreme Court of Michigan, which concluded in *Bryant* that no ongoing emergency existed (*see Bryant v Michigan*, 483 Mich 132, 144-147, 768 NW2d 65, 71-73 [2009]), we assume that such an emergency existed. Nonetheless, the United States Supreme Court made clear that "the existence *vel non* of an ongoing emergency" is neither "dispositive" nor "the touchstone of the testimonial inquiry," but merely one factor to be considered in assessing the primary purpose of the interrogation (*Bryant*, 562 US at —, 131 S Ct at 1160, 1165). Particularly as to the statements and actions of the participants, there are significant distinctions between the facts of the instant appeal and the facts presented to the United States Supreme Court in *Bryant*, and the Court of Appeals in *Bradley* and *Nieves-Andino*, which lead us to conclude that, here, the statement made by Isaacs to McGee was nothing less than an "*ex parte accusatory* [statement]" (*Rawlins*, 10 NY3d at 148).

In most of the cases just described, the police officers to whom the challenged statements were made were the first responders to the scene of an emergency or established the first line of communication with a potential victim and, thus, were charged initially with "find[ing] out the nature of the attack, 'so that [they] could decide what, if any, action was necessary to prevent further harm'" (*Nieves-Andino*, 9 NY3d at 16, quoting *Bradley*, 8 NY3d at 127). Here, McGee was not the first officer to arrive on the scene. Rather, there were other officers and a police van already present, and another officer with Isaacs himself. It stands to reason that the other officers would have already endeavored to determine the nature of any emergency that may have existed and to implement such actions as they deemed necessary to deal with the emergency.

Upon his arrival at the scene, McGee did not speak to the other officers, but went directly to the one apparent eyewitness to the crime, and immediately asked "Who shot you?" This differs from the initial inquiries made by the officers in *Nieves-Andino* and *Bryant*. In *Nieves-Andino*, the officers first asked the victim's name, address, and telephone number (*see Nieves-Andino*, 9 NY3d at 14). After obtaining the victim's identifying information, they asked him "what had happened" (*id.*). The Court of Appeals considered " 'the nature of what was asked' " and concluded that the questions were " 'necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what happened in the past' " (*id.* at 16, quoting *Davis v Washington*, 547 US at 827). Similarly, in *Bryant*, the officer's first question was "[w]hat happened?" (*Bryant*, 562 US at —, 131 S Ct at 1165.) Here, in contrast to a general inquiry as to what had happened, McGee's question was pointed, and was designed only to learn the identity of the perpetrator (*see People v Porco*, 71 AD3d 791, 792 [2010], *lv granted* 15 NY3d 854 [2010] [an affirmative nod made "in response to probing, direct questions by the detective," as to the identity of the perpetrator, constituted testimonial hearsay subject to exclusion pursuant to *Crawford*]). While, in *Davis* and *Bryant*, efforts were also made to establish the identity of the assailant, such questions were merely part of a general battery of questions, which in *Davis*, were posed for the purpose of eliciting information concerning emergency events as they were actually happening (*see Davis*, 547 US at 817-818), and in *Bryant*, to "assess the situation" and the potential threat to public safety (*Bryant*, 562 US at —, 131 S Ct at 1166 [internal quotation marks omitted]).

No such precautionary or remedial purpose can reasonably be attributed to McGee's inquiry, as demonstrated most prominently by the remainder of the conversation. Getting no response to his initial inquiry "Who shot you," McGee then informed Isaacs "I don't think you're going to make it," and repeated: "Who shot you" or "why don't you tell me who shot you." As McGee's advisement "I don't think you're going to make it" plainly demonstrates, his "evident reason" for asking "Who shot you" was not "to deal with an emergency" (*Bradley*, 8 NY3d at 125), but to give Isaacs what might have been—and, in fact, turned out to be—his final opportunity to bear witness against his assailants.

Indeed, upon learning the identity of the shooter, McGee next set out to "preserve the crime scene." McGee explained that the

purpose of this activity was to locate and secure evidence, and to locate any witnesses to the crime.

Moreover, from Isaacs's point of view, his statement "Tom shot me" could not reasonably be viewed as "proclaim[ing] an emergency and seek[ing] help" (*Davis*, 547 US at 828). In contrast to the witness in *Davis*, whose statements "served the primary purpose of aiding the police in an ongoing emergency, not [of] implicat[ing] [the] defendant" (*Rawlins*, 10 NY3d at 152), Isaacs, having already been attended to by a police officer who had responded to the scene before McGee, and having been advised that he probably was not going to "make it," could only have reasonably expected that his response to McGee's pointed inquiry would "be used prosecutorially" (*Crawford*, 541 US at 51). Indeed, while not as obvious as the "extreme example" offered in *Bryant*, the inquiry "Who shot you? I don't think you're going to make it. Who shot you?" is closer to " 'Tell us who did this to you so that we can arrest and prosecute them' " (*Bryant*, 562 US at —, 131 S Ct at 1161), than it is to a general inquiry beginning with "what happened?" In other words, "the victim's response . . . appears purely accusatory . . . by virtue of the phrasing of the question" (562 US at —, —, 131 S Ct at 1161, 1163).

The United States Supreme Court has expressly rejected the implication that "virtually any 'initial inquiries' " at the crime scene will be nontestimonial (*Davis*, 547 US at 832). While, the Court recognized, "[s]uch exigencies may *often* mean that 'initial inquiries' produce nontestimonial statements," where "statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial" (*Davis*, 547 US at 832). Here, while McGee's inquiry was made at the crime scene, shortly after the shooting had occurred, the totality of the surrounding circumstances objectively indicates that McGee's primary purpose was "to nail down the truth about past criminal events" (*Rawlins*, 10 NY3d at 148 [internal quotation marks omitted]). He intended to, and did, elicit statements that "do precisely *what a witness does* on direct examination"— " 'accuses' a perpetrator of a crime" (*Rawlins*, 10 NY3d at 148 [internal quotation marks omitted]). Accordingly, we conclude that Isaacs's statement "Tom shot me" constituted testimonial hearsay (*see Crawford*, 541 US 36; *Davis*, 547 US 813; *Porco*, 71 AD3d at 792; *cf. People v Johnson*, 66 AD3d 703 [2009]; *People v Dasque*, 44 AD3d 681 [2007]).

Our conclusion that Isaacs's statement was testimonial, however, does not end our inquiry. As previously noted, *Crawford* overturned the analysis of the Confrontation Clause adopted in *Roberts*, concluding that "[t]he *Roberts* test allow[ed] a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability" (*Crawford*, 541 US at 62). It held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination" (*id.* at 68). As this reference to "common law" suggests, the Supreme Court in *Crawford* " 'turn[ed] to the historical background of the Clause to understand its meaning,' and relied primarily on legal developments that had occurred prior to the adoption of the Sixth Amendment to derive the correct interpretation" (*Danforth v Minnesota*, 552 US 264, 270 [2008] [citation omitted], quoting *Crawford*, 541 US at 43).

In examining the historical record, the Court concluded that, while there were exceptions to the general rule of exclusion of unconfronted evidence at common law, "there [was] scant evidence that exceptions were invoked to admit *testimonial* statements against the accused in a *criminal* case" (*Crawford*, 541 US at 56). The Court found "one deviation," however, involving dying declarations, and concluded that "[t]he existence of that exception as a general rule of criminal hearsay law cannot be disputed" (*id.* at 56 n 6; *see Mattox v United States*, 156 US 237, 243-244 [1895] ["'(T)here could be nothing more directly contrary to the letter of the (Confrontation Clause) than the admission of dying declarations . . . yet from time immemorial, they have been treated as competent testimony, and no one would have the hardihood at this day to question their admissibility"]; *Mattox v United States*, 146 US 140, 151 [1892] ["Dying declarations are admissible on a trial for murder, as to the fact of the homicide and the person by whom it was committed"]; *People v Nieves*, 67 NY2d 125, 131 [1986] ["formal recognition of a dying declarations exception occurred by the middle of (the 18th) century"]; *Wilson v Boerem*, 15 Johns 286, 291 [Sup Ct, NY County 1818] [recognizing as a "long . . . established rule" the admissibility in homicide cases of a "declaration of the deceased, after the mortal blow, as to the fact itself, and the party by whom it was committed"]; *King v Woodcock*, 168 Eng Rep 352, 353-354, 1 Leach 500, 501 [1789] [acknowledging that while the "most common and ordinary species of legal evidence" consists of testimony "received under all the advantages which . . .

cross-examination can give," also "admitted by law" was "the dying declaration of a person who has received (the) fatal blow"]; *King v Reason*, 93 Eng Rep 659, 659-660 [1721]).

Significantly, the Court acknowledged: "[a]lthough many dying declarations may not be testimonial, there is authority for admitting even those that clearly are" (*Crawford*, 541 US at 56 n 6, citing *King v Woodcock*, 168 Eng Rep at 353-354, 1 Leach 500 at 501-504 [admitting paradigmatic testimonial statements made to a Justice of the Peace on the victim's death bed, subject to the jury's determination that the victim was aware of her impending death]; *King v Reason*, 93 Eng Rep at 660 [admitting "declarations made by the deceased on his death-bed, whereby he charged the defendants with barbarously murdering him," despite lack of opportunity to cross-examine]). The *Crawford* Court determined, however, that it "need not decide in [that] case whether the Sixth Amendment incorporate[d] an exception for testimonial dying declarations," noting that "[i]f this exception must be accepted on historical grounds, it is *sui generis*" (541 US at 56 n 6; *see Bryant*, 562 US at — n 1, 131 S Ct at 1151 n 1 [recognizing that *Crawford* acknowledged a potential dying declarations exception, but not reaching the issue because the State failed to preserve its argument with regard to dying declarations]). While the Court has made reference to "the dying-declarations exception" (*Giles v California*, 554 US 353, 362 [2008]), it has never had the opportunity to resolve the question.

We conclude, nonetheless, that the dicta contained in *Crawford* is strongly suggestive of the Supreme Court's position on this issue, particularly in light of the decision's fundamental reasoning that "the 'right . . . to be confronted with the witnesses against him,' is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding" (*Crawford*, 541 US at 54 [citation omitted]). Indeed, in so determining, the Court cited to *Mattox*, which observed: "Many of [the Constitution's] provisions in the nature of a bill of rights are subject to exceptions, recognized long before the adoption of the constitution, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected" (*Mattox v United States*, 156 US 237, 243 [1895]).

■ Thus, we read *Crawford* to signify that the substance of the right of confrontation enshrined in the Constitution is informed by the contemporaneous understanding of that right

at common law, and is not, instead, an abrogation of it. We therefore conclude that the Supreme Court, having suggested that the common-law right did not encompass dying declarations, would likely determine that the same is true of the Sixth Amendment. In any event, " '[c]onsidering the Supreme Court's guidance on the issue, we are reluctant to expand that right beyond the historical parameters indicated in *Crawford*' " (*Commonwealth v Nesbitt*, 452 Mass 236, 251, 892 NE2d 299, 311 [2008], quoting *People v Gilmore*, 356 Ill App 3d 1023, 1033, 828 NE2d 293, 302 [2005]). Accordingly, we join all of the other state courts that have decided this question, and conclude that "the Sixth Amendment incorporates an exception for testimonial dying declarations" (*Crawford*, 541 US at 56 n 6; *see State v Beauchamp*, 796 NW2d 780 [Wis 2011]; *Commonwealth v Nesbitt*, 452 Mass 236, 892 NE2d 299 [2008]; *State v Jones*, 287 Kan 559, 197 P3d 815 [2008]; *State v Lewis*, 235 SW3d 136 [Tenn 2007]; *Harkins v State*, 122 Nev 974, 143 P3d 706 [2006]; *State v Martin*, 695 NW2d 578 [Minn 2005], *abrogated on other grounds* 547 US 813; *People v Monterroso*, 34 Cal 4th 743, 750, 101 P3d 956, 963 [2004]; *State v Calhoun*, 189 NC App 166, 657 SE2d 424 [Ct App 2008]; *People v Taylor*, 275 Mich App 177, 737 NW2d 790 [Ct App 2007]; *People v Gilmore*, 356 Ill App 3d 1023, 828 NE2d 293 [2005]; *Wallace v State*, 836 NE2d 985 [Ind Ct App 2005]; *but see United States v Mayhew*, 380 F Supp 2d 961 [SD Ohio 2005]; *United States v Jordan*, 2005 WL 513501, 2005 US Dist LEXIS 3289, 66 Fed R Evid Serv 790 [D Colo 2005] [unpublished]).

We note that, while we are, "of course, bound by the decisions of the Supreme Court in matters of federal law," it is a matter for the independent judgment of the courts of this state to determine whether "in a particular case, the New York State Constitution provides greater protection than is afforded by the Federal Constitution" (*People v Alvarez*, 70 NY2d 375, 378 [1987]; *see People v P.J. Video*, 68 NY2d 296 [1986], *cert denied* 479 US 1091 [1987]). Nonetheless, the appellant does not argue that the State Constitution is more protective of the right of confrontation than the Federal Constitution. To the contrary, the appellant includes only a lone citation to the state constitutional provision, which appears alongside a citation to the Sixth Amendment. Accordingly, we follow the example of our Court of Appeals in *People v Bradley* (8 NY3d at 126) and accept the federal jurisprudence as the basis for our decision due to the appellant's failure to argue otherwise.

Having determined that an exception to the right of confrontation exists for dying declarations, we must now determine whether the hearsay statement at issue here falls within that exception. In New York, dying declarations are admissible in a criminal prosecution "for the death of the declarant," where "the statements concern the circumstances of his [or her] death," and "[are] spoken under a sense of impending death, with no hope of recovery" (*Nieves*, 67 NY2d at 132 n 3, 132; *see People v Allen*, 300 NY 222, 227 [1949]; *People v Becker*, 215 NY 126, 144-146 [1915]). "Belief by the declarant that death is possible, or even probable, is not sufficient" (*Nieves*, 67 NY2d at 133). "Rather, '[t]here must be a settled hopeless expectation . . . that death is near at hand' " (*id.* [internal quotation marks omitted], quoting *Shepard v United States*, 290 US 96, 100 [1933]).[2]

"[T]he requisite state of mind of [the] declarant may be found from all of the circumstances surrounding the statement sought to be admitted," and the declarant need not have "actually expressed a certainty of impending death" (*Nieves*, 67 NY2d at 133-134). Among the factors to be considered are "the nature and severity of the wound, as apparent to the declarant; whether the person's condition appeared to be improving or declining when the declaration was made; and, whether any actions normally associated with an expectation of imminent death . . . were taken" (*id.* at 134).

We are cognizant of the "degree of skepticism" with which the Court of Appeals has "always regarded dying declarations" (*id.* at 133).

> "Dying declarations are dangerous, because made with no fear of prosecution for perjury and without the test of cross-examination . . . It is for those salutary reasons that extreme caution is required of the trial court before a dying declaration is received

---

**2.** We recognize that the Supreme Court did not provide any guidance in *Crawford* or any subsequent decision as to the definition of "dying declaration" that will satisfy federal constitutional standards, though it might reasonably be assumed that any such formalization would be faithful to the exception as it existed "at the time of the founding" (*Crawford*, 541 US at 54). We need not, however, explore the parameters of such a definition because the parties here do not argue in favor of a narrower definition than that applicable under New York law, which is consistent with early Supreme Court precedent (*see Shepard v United States*, 290 US 96, 99-100 [1933]; *Mattox v United States*, 146 US 140, 151 [1892]). We therefore apply the New York law definition to the present case.

in evidence[;] . . . there must be clear proof of the certainty of speedy death, and that the declarant had no hope of recovery" (*People v Bartelini*, 285 NY 433, 440 [1941]).

Moreover, " '[t]he declaration is kept out if the setting of the occasion satisfies the judge, or in reason ought to satisfy him [or her], that the speaker is giving expression to suspicion or conjecture, and not to known facts' " (*id.*, quoting *Shepard*, 290 US at 101).

■ Those high standards have been satisfied here, unlike in *Nieves*, in which the Court of Appeals determined that "the circumstances were simply insufficient to infer the requisite state of mind" (*Nieves*, 67 NY2d at 134). There, the victim was brought to the hospital with a stab wound (*id.* at 128). Significantly, the doctor testified that at the time the victim made the challenged declaration, the doctor "did not think that she would die" and the record was "clear that when she spoke her condition was improving, or at least stabilizing" (*id.* at 134). Moreover, "[a]lthough the wound turned out to be fatal, it was not of such nature that its severity would have been obvious to" the victim (*id.*).

Here, in contrast, Isaacs was shot six times. Three of the bullets entered Isaacs's abdomen, the right side of his back, and the left side of his back, respectively, perforated his kidney, liver, and small and large intestines, fractured two vertabrae and the spinal cord, and passed into his chest cavity, perforating the middle and lower lobes of the right lung. Isaacs's condition appeared to be declining, rather than improving, at the time the declarations were made, as McGee testified that Isaacs was struggling to breathe and once he told McGee that "Tom" shot him, was unable to speak any further in response to McGee's subsequent inquiries. Further, while there were no medical personnel on the scene at that time who could have expressed an opinion to Isaacs as to his condition, McGee informed Isaacs that he did not think he would live. There is also no indication that Isaacs, who was shot at relatively close range, based his identification of the shooter on suspicion or conjecture. Under these circumstances, Isaacs's statement "Tom shot me" was properly admitted as a dying declaration (*see People v Harris*, 180 AD2d 819 [1992]; *People v Jordan*, 135 AD2d 652, 652-653 [1987]; *People v Lopez*, 125 AD2d 498 [1986]; *People v Ward*, 119 AD2d 840, 841 [1986]; *People v Liccione*, 63 AD2d 305 [1978], *affd* 50 NY2d 850 [1980]; *cf. People v Allen*, 300 NY 222 [1949]; *People v Esteves*, 152 AD2d 406, 410 [1989]).

The appellant's remaining contentions are without merit. Accordingly, the judgment is affirmed.

DICKERSON, ENG and LOTT, JJ., concur.

Ordered that the judgment is affirmed.