FILED
COURT OF APPEALS
DIVISION II

2013 DEC 20 AM 8: 37

STATE OF WASHINGTON
BY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42855-5-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| LYRIC LEEYN CLINE, | |
| Appellant. | |

BJORGEN, J. — Lyric L. Cline appeals his conviction for second degree assault. During the trial, Cline's victim, Larissa Oien, failed to appear, but the trial court admitted a tape recording of her 911 call and allowed the responding officer to testify to statements she made about the assault. Cline claims that the admission of this evidence violated his constitutional right to confront the witnesses against him and evidence rules forbidding the admission of hearsay testimony. Cline also contends that his attorney performed deficiently when he decided not to cross-examine Oien at a pretrial hearing.

Because Oien made the statements at issue for the primary purpose of seeking aid in an on-going emergency, they were nontestimonial and did not implicate Cline's confrontation clause rights. Further, we conclude that the trial court did not abuse its discretion in allowing the State to introduce Oien's statements under the excited utterance exception to the hearsay rule. Finally, because Cline's attorney had legitimate reasons not to cross-examine Oien at the pretrial hearing, we hold that Cline did not receive ineffective assistance of counsel. Consequently, we affirm Cline's conviction.

## I. FACTS AND PROCEDURAL HISTORY

On June 30, 2011, Oien and Cline, her boyfriend, had a violent argument at their apartment. During the altercation Cline repeatedly strangled and punched Oien. At some point Cline told Oien that he was afraid that their neighbors may have heard the assault and that she had to drive him away from the apartment. While in the car, Cline threatened to kill Oien and himself and punched and spit on Oien. Cline also "made comments that he wanted to die suicide by cop."[1] 4 Report of Proceedings (RP) at 168.

Oien eventually escaped from the car and began to run away. Cline got into the driver's seat, chased Oien for some way, and then drove off. Oien ran to a nearby Home Depot where she called 911. During the 911 call Oien stated she was reporting an assault, described where and when the assault happened, gave her name, gave Cline's name and description, explained the extent of her injuries and declined medical assistance, informed the operator that Cline had taken her car and that she did not know where he had gone, stated that Cline was suicidal and armed with a knife, and told the operator that Cline did not have a cell phone. Oien broke down in tears when asked her name during the call, and some of her answers were not responsive to the questions asked. *See* Ex. 1.

The 911 operator dispatched Officer Daniel Bortle of the Tacoma Police Department to the Home Depot to speak with Oien. When Bortle arrived about 20 minutes after the 911 call, he found Oien frantic and distracted, crying "like a small child would cry and lose their breath." 4

---

[1] "Suicide-by-cop" is "[a] form of suicide in which the suicidal person intentionally engages in life-threatening behavior to induce a police officer to shoot the person. Frequently, the decedent attacks the officer or otherwise threatens the officer's life, but occasionally a third person's life is at risk." BLACK'S LAW DICTIONARY 1571 (9th ed. 2009).

RP at 162. Bortle also observed bruises on Oien's face, neck, chest, and arms. Bortle had difficulty getting Oien to focus or answer his questions and took her outside to the Home Depot's parking lot to interview her. Oien essentially told Bortle the same things she had told the 911 operator, adding that Cline had announced his intention to die by "suicide-by-cop." 4 RP at 168.

At the end of the interview, Oien said that she was afraid to go home and told Bortle she planned to go to her father's house to hide from Cline. Later that day, Bortle heard a dispatch about an incident at an address he recognized as belonging to Oien's father. He responded and contacted Oien, who informed him that Cline had been waiting for her at the house, but had run off when her father asked a neighbor to call 911.

The next day, Bortle chanced across Oien's car and found her there with Cline. Bortle immediately arrested Cline. During this exchange, Oien told Bortle that Cline had not actually assaulted her, but that an unnamed woman had inflicted her wounds.[2]

The State charged Cline with second degree assault based on the incident. Cline moved to suppress the recording of Oien's 911 call and the statements that she made to Bortle. At the pretrial hearing on the 911 call's admissibility, the State called Oien to testify in order to authenticate the tape. Oien authenticated the tape by identifying her voice and stating that the recording was accurate. Cline's attorney declined to cross-examine Oien. Both parties agreed that the tape was authenticated and that, if Oien testified, there would not be a *Crawford*[3] issue. Cline argued that the recording was inadmissible hearsay and asked the trial court to exclude it.

---

[2] At trial a forensic nurse testified that Oien's wounds were consistent with those that Cline's assault, as Oien had described it to Bortle, would produce.

[3] *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

The trial court found that Oien's statements were admissible as excited utterances and admitted the tape and her statements to Bortle.

On the first day of trial, Oien failed to appear and the State requested a material witness warrant to compel her presence at trial. The trial court issued the warrant, but police were unable to locate Oien and she never testified at trial. Due to Oien's absence, Cline objected to admitting both the 911 recording and Oien's statements to Bortle based on *Crawford* and the rules against admitting hearsay. The trial court rejected these arguments, finding that Oien's statements were nontestimonial because their primary purpose was to request aid and that both statements were admissible as excited utterances.

The jury heard the 911 tape and Bortle's testimony and found Cline guilty of second degree assault. Cline appeals his conviction.

## II. ANALYSIS

Cline alleges that the admission of Oien's out-of-court statements about the assault unconstitutionally deprived him of his Sixth Amendment right to confront the witnesses against him and allowed the jury to hear inadmissible hearsay. He also maintains that his attorney's deficient performance deprived him of his right to counsel guaranteed by the Sixth Amendment. We review de novo Cline's confrontation clause and ineffective assistance of counsel claims. *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012); *State v. A.N.J.*, 168 Wn.2d 91, 109, 225 P.3d 956 (2010). We review the admission of an out-of-court statement as an excited utterance for an abuse of discretion by the trial court. *State v. Young*, 160 Wn.2d 799, 806, 161 P.3d 967 (2007).

A.    The admission of Oien's out-of-court statements did not violate Cline's rights under the confrontation clause of the United States Constitution.

1. The application of the confrontation clause to out-of-court statements

The confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The confrontation clause embodies the belief that criminal defendants should have the opportunity to test evidence against them in the adversarial "crucible of cross-examination." *Michigan v. Bryant*, --- U.S. ---, 131 S. Ct. 1143, 1157, 179 L. Ed. 2d 93 (2011). To this end, where the confrontation clause applies, it excludes a declarant's out-of-court statements unless the declarant either appears at trial for cross examination or is unavailable for trial but the defendant had a prior opportunity for cross examination. *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

The confrontation clause, by its own terms, however, applies only to witnesses, meaning those who "'bear testimony'" against the defendant. *Crawford*, 541 U.S. at 51 (quoting 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). To determine whether one making a statement to a law enforcement officer or agent has become a witness, we look to the speaker's primary purpose in making the statement. *Bryant*, 131 S. Ct. at 1153, 1156; *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). A witness's statements are testimonial because he or she makes "'[a] solemn declaration or affirmation . . . for the purpose of establishing or proving some fact.'" *Crawford*, 541 U.S. at 51 (quoting 2 N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (definition of "testimony")). But "[n]o 'witness' goes into court to proclaim an emergency and seek help." *Davis*, 547 U.S. at

828. Following this logic, statements "are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. Conversely, "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 822.

"To determine whether the 'primary purpose' of an interrogation is 'to enable police . . . to meet an ongoing emergency,' . . . we objectively evaluate the circumstances in which the encounter occur[red] and the statements and actions of the parties." *Bryant*, 131 S. Ct. at 1156 (quoting *Davis*, 547 U.S. at 822). The Supreme Court first defined its primary purpose test in its disposition of a set of consolidated cases: *Davis*, 547 U.S. at 813 and *Hammon v. Indiana*, 546 U.S. 976, 126 S. Ct. 552, 163 L. Ed. 2d 459 (2005). The court later refined this test in *Bryant*. These cases control our disposition of Cline's case.

The facts presented here are similar to those in *Davis*, which also involved a 911 call reporting a domestic violence assault. *Davis*, 547 U.S. at 817. The woman making the call, Michelle McCottry, stated that her ex-boyfriend, Davis, had just assaulted her and told the operator that the boyfriend was still on the scene. *Davis*, 547 U.S. at 817-18. The officers arrived to find McCottry frightened and preparing to flee the residence. *Davis*, 547 U.S. at 817-18.

The State obtained a conviction after playing the 911 call despite McCottry's failure to appear at trial. *Davis*, 547 U.S. at 818-19. Davis appealed on confrontation clause grounds, and

6

the Supreme Court affirmed his conviction after determining McCottry was not a witness within the meaning of the confrontation clause because she made nontestimonial statements. The court reached this conclusion by reasoning that McCottry spoke to the 911 operator for the primary purpose of obtaining police assistance to deal with an ongoing emergency; her statements were not directed at establishing the facts of a past crime in order to identify or convict the perpetrator. *Davis*, 547 U.S. at 826-29. Four factors led the court to this conclusion. First, McCottry described events essentially as they were happening, rather than some time after the fact. *Davis*, 547 U.S. at 827. Second, the court reasoned that any objective listener would understand that McCottry, whose assailant was still in her immediate vicinity, faced a real and ongoing emergency. *Davis*, 547 U.S. at 827. Third, the court found that the questions the 911 operator asked, including those necessary to determine Davis's identity and evaluate the threat that he posed, were necessary to resolve the emergency. *Davis*, 547 U.S. at 827. Finally, the court found the informality of McCottry's interaction with the 911 operator indicated she was not making a solemn declaration or affirmation and thus not making testimonial statements. *Davis*, 547 U.S. at 827.

The facts here are distinguishable from those in *Hammon*. There, police responded to a domestic violence call and found Amy Hammon sitting on the porch. *Davis*, 547 U.S. at 819. Hammon appeared shaken, but, in response to police questioning, insisted that nothing was wrong and declined medical aid. *Davis*, 547 U.S. at 819. Police nonetheless convinced her to let them in the house, where they found a broken heater surrounded by pieces of glass. *Davis*, 547 U.S. at 819; *Hammon*, 829 N.E.2d at 819. The officers then questioned Hammon away from her husband, and she told them that her husband had broken the heater and then shoved her into the

7

pieces of glass, beaten her, attacked her daughter, and destroyed some of her property. *Davis*, 547 U.S. at 819.

The husband was convicted of offenses related to the assault and appealed on confrontation clause grounds, arguing that since his wife did not appear, the State could not introduce her statements through testimony by the responding officers or through her own affidavit. *Davis*, 547 U.S. at 820-21. The Supreme Court agreed and reversed the conviction, finding Hammon's statements testimonial under the factors it laid out in *Davis*. First, Hammon did not narrate presently occurring events when she spoke with police; the assault had ended and she initially told the officers that everything was fine. *Davis*, 829 N.E.2d at 829-30. Second, since the police had secured Hammon's safety and she had declined medical aid by the time she spoke with the officers, an objectively reasonable listener would realize that she was not facing an ongoing emergency when she made her statements. *Davis*, 547 U.S. at 829-32. Third, the court determined that the police questions were necessary to prove past events, the purpose and hallmark of testimony, not to resolve any emergency Hammon faced. *Davis*, 547 U.S. at 830. Finally, the court found Hammon's interaction with police was formal; the officers separated her from other witnesses and the interview produced a signed affidavit introduced into evidence. *Davis*, 547 U.S. at 830. Unlike Hammon's statements, Oien's statements to the 911 operator and to Bortle were made to help resolve an ongoing emergency.

In *Bryant*, 131 S. Ct. at 1150, police asked Covington, a man found dying from a gunshot wound, "what had happened, who had shot him, and where the shooting had occurred." Covington told them he had, around a half-an-hour before, been conversing with an acquaintance, Bryant, through the door to Bryant's house. *Bryant*, 131 S. Ct. at 1150. At the

end of the conversation, when Covington turned to leave, Bryant shot him through the door. *Bryant*, 131 S. Ct. at 1150. After 10 minutes of questioning, police went to Bryant's house where they found blood, a bullet, a hole in the door, and the victim's wallet outside.

Bryant was convicted of murder after the police officers testified about Covington's statements. *Bryant*, 131 S. Ct. at 1151-53. Bryant appealed his conviction on confrontation clause grounds and the Supreme Court affirmed his conviction after holding that Covington's statements were nontestimonial. *Bryant*, 131 S. Ct. at 1167. The court rested this conclusion on the circumstances of the police interaction with Covington and the statements made by both Covington and the police. *Bryant*, 131 S. Ct. at 1166-67. Although Bryant had shot Covington more than 30 minutes before police interrogated Covington, Bryant remained at large while Covington spoke to the police. *Bryant*, 131 S. Ct. at 1166. Given Bryant's unknown location and possession of a firearm, and Covington's medical condition, the court concluded that any objective listener would realize that Covington faced an ongoing emergency. *Bryant*, 131 S. Ct. at 1165-66. The court reasoned that the police officers' questions, those intended to help them identify and assess the threat posed by Bryant, "were the exact type of questions necessary" to resolve the emergency Bryant posed. *Bryant*, 131 S. Ct. at 1166. Finally, the court noted that Covington's interaction with police, occurring in an unsecured, chaotic scene and in an unstructured way, lacked the formality associated with testimony. *Bryant*, 131 S. Ct. at 1166.

2. Oien's statements to the 911 operator were nontestimonial because, objectively viewed, she made them to seek police aid in the face of an ongoing emergency.

The facts in *Davis* are closely analogous to the facts here. Both cases involve 911 calls made to report incidents of domestic violence. Following *Davis*, we examine four criteria:

whether the speaker's statements narrate contemporaneous events or describe past events, whether a reasonable listener would understand the speaker faced an ongoing emergency, whether the police officer's questions and the speaker's answers are necessary to resolve the ongoing emergency, and the formality of the interaction. *Davis*, 547 U.S. at 827.

The first *Davis* factor looks to whether the witness is narrating ongoing events or making statements about past events. A speaker may speak contemporaneously of past events if the speaker connects the past events with ongoing ones. *State v. Koslowski*, 166 Wn.2d 409, 422 n.8, 209 P.3d 479 (2009) ("[I]t is not inconsistent to speak of past events in conjunction with an ongoing emergency and, in appropriate circumstances, considering all of the factors the Court identified [in *Davis*], the fact that some statements are made with regard to recent past events does not cast them in testimonial stone.").

While Oien spoke of the assault, a past event, her statements were made in fear for her immediate safety due to the continuing threat from Cline. Oien informed the 911 operator that Cline had threatened to kill her, threatened to kill himself, stolen her car, and that she had no idea of his whereabouts. In this sense, the threat Cline posed to Oien was current and continuing when she spoke with the 911 operator. *Koslowski*, 166 Wn.2d at 422 (statements are contemporaneous where the speaker is "still in danger" from the suspect).

The second *Davis* factor looks to whether an objective listener would recognize that the witness faced an ongoing emergency. This evaluation "is a highly context-dependent inquiry." *Bryant*, 131 S. Ct. at 1158. Relevant factors include whether police have "neutralized" the risk a suspect poses to the witness, the general public, or the police themselves; the type of risk posed

by any weapons the suspect might have; and the victim's medical state. *Bryant*, 131 S. Ct. at 1158-59.

A reasonable listener would recognize that Oien faced an ongoing emergency when she spoke with the 911 operator.[4] While Oien declared that she did not need medical assistance, like Hammon, she did report that Cline had assaulted her and threatened both her life and his own. Like Bryant, Cline was at large and at an unknown location when his victim spoke with police. Like McCottry, Oien was asking for police protection from the threat Cline posed. Further, like the scenes in *Davis* and *Bryant*, Oien spoke in an unsecured, public location. In this context, the 911 call objectively looks "plainly [like] a call for help against [a] bona fide physical threat." *Davis*, 547 U.S. at 827.

The third *Davis* factor looks to whether the questions police ask and the answers the witness gives are necessary to resolve an ongoing emergency the witness faced. The fact that police ask about the identity of the perpetrator or the facts of the crime does not necessarily make the witness's answers testimonial. *Bryant*, 131 S. Ct. 1165-66; *Davis*, 547 U.S. at 827. Questions intended to allow the police to "assess the situation and the threat to the safety of the victim and themselves" may elicit nontestimonial answers. *Koslowski*, 166 Wn.2d at 425-28 (citing *People v. Bradley*, 8 N.Y.3d 124, 862 N.E.2d 79, 830 N.Y.S.2d 1 (2006); *State v. Shea*, 2008 VT 114, 965 A.2d 504, 509)). This is especially true where the questions involve an at-large suspect posing a threat to the safety of the victim, police officers, or the general public. *Bryant*, 131 S. Ct. at 1166; *Koslowski*, 166 Wn.2d at 427-28 (citing *People v. Nieves-Andino*, 9

---

[4] A principal role of 911 operators is to respond to emergencies.

N.Y.3d 12, 13, 872 N.E.2d 1188, 840 N.Y.S.2d 882 (2007); *State v. Ayer*, 154 N.H. 500, 509-10, 917 A.2d 214 (2006); *United States v. Arnold*, 486 F.3d 177, 179-80 (6th Cir. 2007)).

The questions and answers found in the 911 call were plainly oriented towards addressing the threat Cline posed to Oien and himself. Oien only described the assault at two points in the call: when the operator asked her what she had called to report and when the operator asked how Cline had hit her. While the second question appears, when viewed in isolation, as an attempt to elicit testimony, the sequence of questions indicates that the operator asked the question to determine whether Oien needed medical assistance. The questions about Cline's name, description, whereabouts, possession of weapons, state of mind, and the police's ability to contact Cline were necessary for the operator to determine whether police would "be encountering a violent felon" when responding and how they might resolve the situation. *See* Ex. 1; *Davis*, 547 U.S. at 827.

The final *Davis* factor looks to the formality of the speaker's interactions with law enforcement personnel. To evaluate the formality of an interaction, we look to the location of the interaction, whether police isolated the person from others for individual questioning, and whether the speaker makes any kind of signed attestation. *Crawford*, 541 U.S. at 51-53 n.4; *Davis*, 547 U.S. at 830. Interactions with 911 operators are typically deemed informal. *Davis*, 547 U.S. at 827 (contrasting the solemnity of a formal police interrogation with a 911 call); *see also Commonwealth v. Galicia*, 447 Mass. 737, 745, 857 N.E.2d 463 (2006) ("[T]he questions occurred in the highly informal setting of a telephone call to a 911 dispatcher."). Oien made the statements at issue in the context of a 911 call. She called 911 from a somewhat chaotic public

place that police had not secured. Given these facts, Oien's statements share nothing with the formality that customarily attends testimony.

Cline makes three arguments as to why we should find Oien's statements to the operator testimonial. First, he argues that Oien spoke of events that had occurred over a half-an-hour before her call and contends this requires a finding that her statements were testimonial. To the contrary, Oien's statements, as discussed above, were contemporaneous with an ongoing emergency and not testimonial under confrontation clause analysis.

Second, based apparently on Oien's demeanor during the call, Cline states that "a reasonable listener would recognize that [Oien] was not facing an ongoing emergency." Br. of Appellant at 12. As we discuss below in our analysis of Cline's hearsay challenge, Oien's demeanor was consistent with one under the stress of a serious emergency. Further, as discussed above, Oien's statements as a whole would leave a reasonable listener with little doubt she faced an ongoing emergency.

Finally, Cline states, without argument, that Oien's statements were not necessary to resolve any ongoing emergency. We generally decline to consider an inadequately briefed argument. *Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wn. App. 474, 486, 254 P.3d 835 (2011). In any event, as discussed above, the operator's questions and Oien's answers, geared as they were to assessing whether Cline was accused of a violent crime, whether he had weapons, how to identify him, and how to contact him, were "the exact type of questions necessary" to resolve the emergency Oien faced. *See Bryant*, 131 S. Ct. at 1166.

We hold that, viewed objectively in light of the surrounding circumstances, Oien's statements to the 911 operator were "plainly a call for help against [a] bona fide physical threat."

13

*Davis*, 547 U.S. at 826. Just as McCottry made nontestimonial statements in *Davis* by speaking to police to obtain help in an emergency, Oien made nontestimonial statements by speaking to the 911 operator to obtain protection from a present and continuing threat from Cline. Under *Davis* and *Bryant*, the trial court did not err in admitting Oien's statements to the 911 operator.

3. Oien's statements to Bortle were nontestimonial because, objectively viewed, she made them to enable the police to respond to the continuing emergency posed by Cline's unknown location and Cline's threats to kill Oien or himself.

The circumstances surrounding Oien's statements to Bortle at the Home Depot closely resemble those in *Bryant*.[5] Both cases involve a victim's statements to a police officer while their violent attacker remained at large and a possible threat to the victim or the police. We therefore apply the analysis used by the *Bryant* court to determine if Oien's statements were testimonial. In doing so, we look objectively at the "statements and actions of the parties to the encounter . . . in light of the circumstances in which the interrogation occurs." *Bryant*, 131 S. Ct at 1162.[6]

---

[5] Bortle also testified that when he responded to the call at Oien's father's house, she told him Cline had just been there and had run off. Objectively, this statement is not testimonial, because it went to helping the police apprehend Cline rather than proving any of Cline's criminal activities. Further, Oien's father testified that he asked a neighbor to call 911 when he and Oien arrived home to find Cline waiting for them, and that Cline had run off in response to the 911 call. Even if we agreed that the trial court erred in admitting Bortle's testimony, any error in admitting these statements was harmless given the fact that Oien's father testified to the exact same subject matter and was subject to cross examination. *See State v. Anderson*, 171 Wn.2d 764, 770, 254 P.3d 815 (2011) (other untainted testimony can render a confrontation clause error harmless, as can the fact that the tainted testimony "added little, if any, evidence to prove the elements of the current charge" against the defendant).

[6] The *Bryant* court cited to *Davis* when it laid out its test to determine if Covington made testimonial statements, but did not analyze all of the *Davis* factors (no mention is made of whether Covington made contemporaneous statements). *Bryant*, 131 S. Ct. at 1162. The test

We first look to the circumstances surrounding the encounter. *Bryant*, 131 S. Ct. at 1163. This requires us to evaluate, in context, the type of threat the suspect posed to the victim, the public, or the police. *Bryant*, 131 S. Ct. at 1158-59, 1163-64. Just as Bryant remained at-large when police spoke with Covington, Cline remained at-large when Oien spoke to Bortle. While Cline did not have a firearm, and thus posed somewhat less of a threat than Bryant possibly did, Cline had a knife and had explicitly threatened to die by suicide-by-cop and to kill Oien. Cline thus posed a definite threat to "the police and the public." *Bryant*, 131 S. Ct. at 1162.

We next examine Bortle's and Cline's statements and actions. *Bryant*, 131 S. Ct. at 1162. Bortle directed his questions to assessing the threat Cline posed, even if these questions occasionally took the form of asking about the assault. Bortle needed to know what type of violence Cline was capable of to determine if he posed a serious threat to Oien and other police officers. *See Bryant*, 131 S. Ct. at 1165-66. Oien was distraught and reported Cline's assault against her and threats against her life. When the interview ended, she expressed her fears that Cline would find her at her home and described her plan to hide at her father's house. Viewed objectively, given this state of affairs, "we cannot say that" Oien "would have had a 'primary purpose' 'to establish or prove past events potentially relevant to later criminal prosecution.'" *Bryant*, 131 S. Ct. at 1165 (quoting *Davis*, 547 U.S. at 822).

---

used in *Bryant* is, however, essentially identical to the second, third, and fourth *Davis* factors (did an emergency exist, what did the police ask and how did the speaker answer, and was the interaction formal). *Bryant*, 131 S. Ct. at 1163-66. Because the *Bryant* court conspicuously did not analyze whether a victim's statements about an at-large suspect posing a threat to persons other than his original victim were testimonial by reference to the *Davis* factors, we do not either, despite the functional equivalence of the tests used in the two cases. To the extent that Cline invokes *Davis* by arguing that Oien made nontestimonial statements to Bortle because the assault had occurred in the past, we reject his claim for the same reason we rejected this argument when made about the 911 call: Cline was at large and an ongoing threat to Oien's person as well as to the safety of responding police officers.

Finally, we look at the formality of Oien's interaction with Bortle. *Bryant*, 131 S. Ct. at 1166. Oien spoke to Bortle in an unsecured public location, not in a police vehicle or a police station. She received no indication she was offering formal testimony, like the *Miranda*[7] warnings in *Crawford*. All objective indications point to the absence of testimonial formality.

Cline asks us to hold that Oien made testimonial statements to Bortle based on three arguments. First, he asserts that the circumstances surrounding Oien's statements to Bortle indicate no ongoing emergency because she was safe in the Home Depot. Cline's argument ignores a central tenant of *Bryant*, namely that a suspect may pose a threat to those beyond the initial victim of his or her crime, such as the police who might respond to that crime. *Bryant*, 131 S. Ct. at 1163-64. Cline's threat to commit suicide-by-cop created an ongoing emergency even if we accept his argument that Oien was safe. *See Bryant*, 131 S. Ct. at 1163-64. Further, Bortle's presence at Home Depot gave Oien at best only a temporary respite from an immediate threat. She knew that as soon as Bortle left, she would be again fully exposed to danger from Cline. Her statements were made in the context of this continuing threat and emergency.

Cline also argues that Oien faced no ongoing emergency because there was no chance that he would show up at the Home Depot. He presents no evidence for this assertion, and because Oien and the police had no idea of his whereabouts, this argument is unpersuasive.

Cline finally contends that Bortle transformed his interaction with Oien into a formal one by taking her out of the Home Depot to question her. Bortle, however, was not isolating Oien from other witnesses so that he could question her in private, as the police did in *Hammon*, but rather because she was so distracted he was having difficulty communicating with her. His

---

[7] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

dialogue with her remained informal and geared toward resolving the emergency she faced; it was not an attempt to question a witness in detail.

We hold that Oien's statements to Bortle at the Home Depot were made for the primary purpose of resolving the emergency created by Cline's unknown whereabouts and his threats to harm Oien, himself, or the police. The admission of these statements did not offend the confrontation clause.

B.     The 911 tape and Bortle's testimony about Oien's statements at the Home Depot fall under the excited utterance exception of the hearsay rule.

Cline next argues that Oien's statements on the 911 tape and those she made to Bortle at the Home Depot were not excited utterances and thus were inadmissible as hearsay. He contends, based on the passage of time between the assault and the call and his characterization of Oien's demeanor during the call, that Oien was no longer under the stress of the assault when she spoke to the 911 operator. Instead, Cline argues that Oien was calm, all her statements were in response to questions, and she was primarily concerned with getting her car back. He makes similar arguments about Oien's statements to Bortle in the Home Depot parking lot. The record, though, flatly contradicts his characterization of Oien's demeanor.

An out-of-court statement is hearsay and generally inadmissible to prove the truth of the matter asserted in the statement. ER 801, 802. However, one of the exceptions to this prohibition, ER 803(a)(2), allows the trial court to admit a person's out-of-court excited utterance. A trial court may admit a statement as an excited utterance if "(1) a startling event or condition occurred, (2) the declarant made the statement while under the excitement or stress of the startling event or condition, and (3) the statement related to the startling event or condition."

17

*Young*, 160 Wn.2d at 806. Because we review the trial court's decision to admit a statement as an excited utterance for an abuse of discretion, "[w]e will not reverse the trial court's decision 'unless we believe that no reasonable judge would have made the same ruling.'" *State v. Ohlson*, 162 Wn.2d 1, 8, 168 P.3d 1273 (2007) (quoting *State v. Woods*, 143 Wn.2d 561, 595-96, 23 P.3d 1046 (2001)).

Cline argues that the passage of time between the assault and the statements prevents their admission as excited utterances. Although Oien did not call 911 until about 30 minutes after the assault, and Bortle did not arrive until approximately 20 minutes later, this lapse of time does not necessarily show that Oien was no longer under the influence of the startling event at the time she made her statements. *See Woods*, 143 Wn.2d at 598-99 (45 minutes elapsed between startling event and statements made to a paramedic). As our Supreme Court has noted, domestic violence can leave the victim of an assault stressed long after the event has ended. *Koslowski*, 166 Wn.2d at 424 (citing *Shea*, 965 A.2d at 509).

We similarly reject Cline's arguments about Oien's demeanor. Contrary to Cline's characterization of the 911 call, Oien demonstrated signs of distress when speaking with the operator. Oien broke down and cried at the beginning of the call and the 911 operator had to repeatedly tell her to take deep breaths before she could continue talking. Furthermore, Oien's answers to the operator's questions were sometimes nonresponsive, and the operator had to repeat some of the questions. For example, at one point the operator asked Oien for Cline's height and she responded that he was blond but shaved his head. Based on the 911 recording as a whole, the trial court could reasonably find that Oien was still under the stress of excitement of the traumatic event when she called 911.

Bortle testified that when he contacted Oien she was hysterically crying, at times so hard she lost her breath. Oien was also frantic, distracted, and afraid. Considering Bortle's observations of Oien's behavior at the scene, the trial court's finding that Oien continued to be under the stress of excitement of the startling event was not an abuse of discretion. Oien's statements on the 911 tape and her statements to Bortle at the Home Depot store fall within the excited utterance exception of the hearsay rule and were properly admitted.

C.    Cline's attorney had legitimate reasons for declining to cross-examine Oien at the pretrial hearing and his performance did not fall below an objective standard of reasonableness.

Finally, Cline maintains that he received ineffective assistance of counsel because his attorney did not cross-examine Oien at the pretrial hearing where Oien authenticated her voice on the 911 tape. Cline asserts that, had his attorney done so, Oien would have recanted her statements that he had assaulted her. We reject this claim as well.

The Sixth Amendment and article I, section 22 of the Washington Constitution each guarantee the effective assistance of counsel to criminal defendants. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011), *on remand*, 168 Wn. App. 635, 278 P.3d 225 (2012). To prevail on an ineffective assistance of counsel claim, a defendant must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Grier*, 171 Wn.2d at 32-33. If the defendant fails to make the necessary showing on one prong of this test, we "need not address the other prong." *State v. Staten*, 60 Wn. App. 163, 171, 802 P.2d 1384 (1991); *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

With regard to the first prong, counsel renders deficient performance if the representation "falls 'below an objective standard of reasonableness.'" *Grier*, 171 Wn.2d at 33 (quoting

*Strickland*, 466 U.S. at 688). We begin our review with "'a strong presumption that counsel's performance was reasonable.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). If counsel's conduct "'can be characterized as legitimate trial strategy or tactics, performance is not deficient.'" *Grier*, 171 Wn.2d at 33 (quoting *Kyllo*, 166 Wn.2d at 863).

While Cline asserts that Oien "clearly" would have recanted her statements to Bortle if asked, we find the issue not so clear cut. By the time of the pretrial hearing, Oien had told two different versions of events, one to the 911 operator and to Bortle immediately after the 911 call stating that Cline had assaulted her, and one to Bortle the next day stating that an unnamed woman had inflicted her wounds. Cline's attorney could not know which story Oien would tell on the stand if he asked her about the events during the pretrial hearing.

The State called Oien at the pretrial hearing solely for the purpose of admitting the tape, and only asked her the questions necessary to authenticate the tape and to lay the foundation for an excited utterance exception. Cline's attorney was prepared to try to exclude the 911 call on the argument Oien was no longer under the stress of the assault when she called 911. Asking Oien, in essence, to recant risked undermining this argument. She might refuse to recant and claim that she had told the truth initially because she was too stressed to fabricate a story. If she recanted, the State might try to rehabilitate its version of events by asking her questions about her stress in the hour after the attack, which would similarly thwart counsel's argument for excluding the tape.

We cannot fault an attorney for making the tactical decision to refuse to ask questions to which he or she does not know the answer. *See Hamburg v. State*, 820 P.2d 523, 528 (Wyo.

20

1991) (no ineffective assistance of counsel where counsel refused to ask questions to which he did not know the answer because doing so is "often suicidal."); *State v. King*, 248 P.3d 984, 994 n.8 (Utah Ct. App. 2010) (no ineffective assistance of counsel in decision not to ask questions with unknown answers during cross examination). We find no deficient performance and reject Cline's ineffective assistance of counsel claim.

### III. CONCLUSION

We hold that Oien's statements to the 911 operator and to Bortle at the Home Depot and at Oien's father's house were nontestimonial and that their admission at trial did not abridge Cline's Sixth Amendment rights. We further hold that the trial court did not abuse its discretion in admitting the 911 statements and the statements to Bortle at Home Depot as excited utterances. Finally, Cline's counsel was not ineffective at the pretrial hearing by failing to cross examine Oien about her 911 call. We therefore affirm Cline's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

BJØRGEN, J.

We concur:

PENOYAR, J.

JOHANSON, A.C.J.

21